UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - x
GABRIEL GONZALEZ               :  No. 12-cv-478(SRU)
                               :  915 Lafayette Boulevard
          vs.                  :  Bridgeport, Connecticut
                               :
                               :  December 9, 2016
WATERBURY POLICE DEPARTMENT,   :
ET AL                          :
- - - - - - - - - - - - - - - - x
```

JURY TRIAL
VOLUME IV

B E F O R E :

THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.
AND A JURY OF EIGHT

A P P E A R A N C E S :

FOR THE PLAINTIFF:

THE CREED LAW FIRM, LLC
99 North Street, Route 6
P.O. Box 575
Bristol, Connecticut  06011
BY:  KEVIN EDWARD CREED, ESQ.

FOR THE DEFENDANT:

OFFICE OF THE CORPORATION COUNSEL
City of Waterbury
235 Grand Street, 3rd Floor
Waterbury, Connecticut  06702
BY:  JOSEPH A. MENGACCI, ESQ.

Sharon L. Masse, RMR, CRR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (860)937-4177

 1              (Commencing at 9:26 a.m., outside the presence

 2    of the jury...)

 3              THE COURT:  Good morning.

 4              MR. MENGACCI:  Good morning, Your Honor.

 5              MR. CREED:  Good morning, Your Honor.

 6              THE COURT:  All right.  We're ready for the jury

 7    instructions and closing arguments.  I just want to be

 8    sure that if either of you want to have exhibits to use

 9    during your closings, that you obtain those in advance so

10    that we're not wasting time going with the clerk, okay?

11              MR. CREED:  Yes, Your Honor.

12              THE COURT:  And you can use anything that was

13    used during trial, either full exhibits or demonstratives

14    during your closings.  Do either of you want the podium

15    brought around?

16              MR. MENGACCI:  No.  I'm okay without that, Your

17    Honor.

18              MR. CREED:  Myself, Your Honor, I don't need the

19    podium.

20              THE COURT:  Okay, very good.  We've got a total

21    of 45 minutes.  How much time are you reserving for

22    rebuttal?

23              MR. CREED:  Fifteen minutes, Your Honor.

24              THE COURT:  Fifteen?  Okay.  Make sure it's

25    rebuttal.  Don't raise for the first time issues in your

1    rebuttal argument.

2              MR. CREED:  Yes, Your Honor.

3              THE COURT:  All right.

4              MR. MENGACCI:  Your Honor did note that we did

5    file a motion for judgment as a matter of law?

6              THE COURT:  I did not see that.

7              MR. MENGACCI:  It was filed yesterday, Your

8    Honor.

9              THE COURT:  Okay.  As you know, I was --

10             MR. MENGACCI:  No, I understand that.  I just

11   didn't want the record not to reflect that and perhaps --

12             THE COURT:  That's fine.

13             MR. MENGACCI:  -- Your Honor, we can take it up

14   later.

15             THE COURT:  Well, I mean, I'll tell you right

16   now, I listened to the evidence.  I think if you want to

17   make a quick argument, go ahead.

18             MR. MENGACCI:  No, that's okay.

19             THE COURT:  I think there's sufficient evidence

20   in the record that, at a minimum, I'll reserve on the

21   motion.

22             MR. MENGACCI:  That's fine.  That's all I wanted

23   on the record at this point --

24             THE COURT:  Okay.

25             MR. MENGACCI:  -- Your Honor.  Thank you.  Can

1    we get exhibits right now from your clerk?

2              THE COURT:  Yes, that's the point, yes.  The

3    other thing I wanted to mention is that we're going to be

4    doing -- we're going to be discussing the jury

5    interrogatories after the jury retires, and I think we had

6    this issue last time as well, but I think it's difficult

7    to craft interrogatories that will get to the qualified

8    immunity issue.  The standard of liability and the

9    standard on qualified immunity are almost identical.  In

10   other words, there has to have been an unreasonable use of

11   force to get liability.  Once there's liability, it's

12   difficult to say that facts arise that although the use of

13   force was unreasonable, reasonable officers could disagree

14   about whether that amount of force was reasonable or not.

15   So it's a very -- it seems to me it's a very, very narrow,

16   and in the excessive force context, practically almost

17   impossible task to successfully argue for qualified

18   immunity after there's been a verdict on liability.

19             So I'm going to want to hear at the appropriate

20   time after the jury retires how any particular proposed

21   interrogatory goes to that issue, that although the use of

22   force -- the amount of force was unreasonable, reasonable

23   officers could disagree about whether that amount of force

24   was reasonable or not.  Or there may be some other reason

25   for your interrogatories.  If there is, I'll be happy

1   to --

2           MR. MENGACCI:  There are other reasons, Your

3   Honor, but we certainly can take that up after the jury

4   retires.

5           THE COURT:  Fair enough.  All right.  Anything

6   else that either of you want to take up?

7           MR. CREED:  No, Your Honor, except I did not

8   file a response last night to Mr. Mengacci's Rule 50

9   motion.  It was not due to indifference; I just didn't

10  receive it until after 6, and I didn't have an opportunity

11  to formulate a response on that, Your Honor, so I didn't

12  want the Court thinking I just received it and just --

13          THE COURT:  That's fine.

14          MR. CREED:  -- ignored it.

15          THE COURT:  No, I'm reserving on it, so --

16          MR. MENGACCI:  I understand.

17          THE COURT:  I think you're meeting a procedural

18  requirement.

19          MR. MENGACCI:  Your Honor, that's exactly what I

20  was going to say.  Thank you very much.

21          THE COURT:  I get it.

22          All right.  Both of you should have received

23  copies of the jury instructions and the verdict form.

24          MR. CREED:  Yes, Your Honor.

25          MR. MENGACCI:  Yes, Your Honor.

```
 1              THE COURT:  And as I noted, each of the jurors
 2   will have that as well.  All right?
 3              MR. MENGACCI:  Your Honor, with regard to --
 4              THE COURT:  Did you want exhibits?  Yes, go
 5   ahead.
 6              MR. MENGACCI:  Yes, I've tried to make copies of
 7   all so I wouldn't have an interruption, but the one that I
 8   do need is the photograph of the automobile, the Neon.  I
 9   don't know -- do you intend to use that?
10              MR. CREED:  Which one?
11              MR. MENGACCI:  The photographs of the car.
12              MR. CREED:  Interior of the -- your car?
13              MR. MENGACCI:  No, my car is not in evidence,
14   just your car.  There it is.  Okay.
15              So do you plan to use any of these?
16              MR. CREED:  Yes.  We'll leave them on here.
17              MR. MENGACCI:  Fine.
18              THE COURT:  All right.
19              MR. MENGACCI:  Yes, Your Honor?
20              THE COURT:  Did the two of you have a chance to
21   work with my law clerk to confirm that the exhibits that
22   are going to go to the jury through the electronic system
23   are all correct, appropriate, nothing extraneous?
24              MR. MENGACCI:  Yes, Your Honor, we worked with
25   your clerk on Wednesday.  There were a few other pieces of
```

1    medical records that required some deletions.  They've

2    been given to your clerk yesterday, and as long as those

3    have been put in place, which I know Michael would have

4    done, we're good to go.

5              THE COURT:  Okay.

6              MR. CREED:  Also, Your Honor, I have some --

7              THE COURT:  Wait.  Mr. Creed, you're good to go

8    as well on the exhibits?

9              MR. CREED:  Oh, yes, Your Honor.  I'm sorry.

10             THE COURT:  All right.  Very good.  Thank you.

11             MR. CREED:  Counsel and I have spoken, and I

12   have what are, in effect, screen shots from the animations

13   that we showed.  I was going to use those in my closing.

14             THE COURT:  I assume no objection?

15             MR. MENGACCI:  No.  They're demonstrative.

16             THE COURT:  Demonstrative, okay.

17             (Pause.)

18             THE COURT:  All set?

19             MR. CREED:  Yes, Your Honor.

20             THE COURT:  All right.  Let's bring the jury in,

21   please.

22             (Jury enters courtroom.)

23             THE COURT:  Good morning, ladies and gentlemen.

24   Welcome back.

25             As I told you, what we're going to do this

1    morning is I'm going to read the jury instructions and

2    tell you what it is you have to decide.  We're then going

3    to hear closing arguments from each side, first from the

4    plaintiff, then from the defense and then from the

5    plaintiff.  And at that point you'll go back and begin

6    deliberating.

7          So you have a copy of these instructions, and

8    hopefully you can follow if you choose to.

9          Members of the jury, you have now heard all the

10   evidence.  At this point I'm going to instruct you about

11   the law that applies to this case.  At the outset I want

12   to express my thanks to you for the time and energy that

13   you've devoted to this trial.  Jury service is rarely

14   convenient, but without you, justice could not be done in

15   this case.  It will take some time for me to read these

16   instructions to you, but it is important that you listen

17   carefully to them.  You've been provided with a copy of my

18   instructions so that you can read along as we go.  Please

19   feel free to write on these copies.  You will be permitted

20   to take them into the jury room with you.

21         My instructions will be in three parts.  First I

22   will discuss general rules concerning the role of the

23   Court and the duty of the jury.  Second, I will go over

24   the issues in this case and set out the specific questions

25   of fact that you must answer based on the evidence at

1   trial.  And third, I will give you some rules and

2   guidelines for your deliberations.

3          Before we begin, I ask you to look over the

4   other document that was placed on your seats, namely, the

5   verdict form.  After I've given these instructions and you

6   hear the closing arguments of counsel, you will go back

7   into the jury room to deliberate.  You will have with you

8   the following:  The original of the verdict form,

9   electronic copies of the exhibits and hard copies of any

10  exhibits that cannot be converted into digital format,

11  your copies of these instructions and any personal notes

12  that you may have taken.  At the conclusion of your

13  deliberations, you will use the verdict form to report

14  your verdict to the Court and the parties.

15         As judge, I perform basically two functions

16  during the trial.  First, I decide what evidence you may

17  consider.  You have heard me doing that throughout the

18  trial.  Second, I instruct you on the law that you are to

19  apply to the facts in this case.  I gave you some

20  preliminary instructions before trial began and some

21  during the course of the trial, but it is now at the close

22  of the evidence that most of the instructions are given,

23  so please be patient and listen closely.

24         Throughout these instructions when I say "the

25  plaintiff," I'm referring to Gabriel Gonzalez.  When the I

1    say "the defendants," I'm referring to Richard Hamel,

2    Jason Lanoie, Maximo Torres and Timothy Jackson.  If

3    either of the lawyers state the law differently from the

4    way I'm explaining it to you, you are to follow my

5    instructions.

6            This is a long instruction and I may repeat

7    certain parts.  That does not mean that those parts should

8    be emphasized.  You should not single out any one part of

9    my instructions and ignore the rest.  Instead, you should

10   consider all the instructions as a whole and consider each

11   instruction in light of all the others.  The order in

12   which I give you instructions does not indicate their

13   relative importance.  Do not read into these instructions

14   or into anything I have said or done any suggestion about

15   what verdict you should return.  That is a matter for you

16   alone to decide.

17           I should also point out that although you have

18   been given a copy of the instructions to follow as I

19   deliver them, if I say aloud anything at all different

20   from what is written, you must follow what I say here in

21   court.

22           Regardless of your ultimate decision about the

23   parties' claims and defenses, the parties in this case are

24   entitled to a full and fair hearing.  You must remember

25   that one of the most important functions of our system is

1    to give all the parties to a dispute a full and fair

2    hearing.  It is your duty, therefore, to give careful

3    thought to every issue set forth by these instructions

4    regardless of any general feeling that you may have about

5    which party is right.

6            It is the duty of an attorney to object to

7    testimony or other evidence that the attorney believes is

8    not properly admissible.  You should not prefer or dislike

9    an attorney or a party because an attorney made objections

10   or because an attorney failed to make objections.  If I

11   have allowed testimony or evidence that an attorney

12   objected to, you should not give that evidence greater or

13   lesser weight.  My rulings on objections have nothing to

14   do with the credibility of the witnesses.  If I have

15   sustained an objection to a question asked of a witness,

16   you must disregard the question entirely and may draw no

17   inferences from the question, nor speculate about what the

18   witness would have said if he or she had been permitted to

19   answer the question.  You must disregard any testimony

20   that I have stricken because it is not evidence.

21           It is your duty to find the facts from all the

22   evidence in the case.  In reaching a verdict, you must

23   carefully and impartially consider all the evidence in the

24   case and then apply the law as I've explained it to you.

25   Regardless of any opinion you may have about what the law

1   is or ought to be, it would be a violation of your sworn

2   duty to base a verdict upon any understanding or

3   interpretation of the law other than the one I give you.

4   And you must do your duty as jurors regardless of any

5   personal likes, dislikes, opinions, prejudices or

6   sympathies.  In other words, you must decide the case

7   solely on the evidence before you, and you must do so

8   fairly and impartially.

9          The verdict you reach must be unanimous, that

10  is, agreed upon by each of you.  You must each decide the

11  case for yourself, but do so only after impartial

12  consideration of the evidence in the case with your fellow

13  jurors.

14         Throughout the remainder of my instructions to

15  you, I will use the word "prove" when talking about what

16  the plaintiff must do in order to win this case.  My use

17  of the word "prove" means prove by the appropriate burden

18  of proof even if I do not always repeat those words.

19  Similarly, when I speak of your finding various facts or

20  the parties establishing various facts, you must determine

21  whether those facts have been proven by the appropriate

22  burden of proof even if I simply use the word "find" or

23  "establish."

24         Because this is a civil case, the plaintiff

25  generally has the burden of proving every disputed part of

1   his claims by a preponderance of the evidence.  To

2   establish a fact by a preponderance of the evidence, the

3   plaintiff must prove that the fact is more likely true

4   than not true.  In other words, if you find that the

5   credible evidence on a given issue is evenly divided

6   between the plaintiff and a defendant, then you must

7   decide that issue for that defendant.  If the plaintiff

8   proves that a fact is more likely true than not, even

9   slightly more true than not, then you are to find that the

10  plaintiff has proven the fact by a preponderance of the

11  evidence.  If the plaintiff fails to prove an issue by a

12  preponderance of the evidence, then you must find that

13  issue in favor of the defendants.

14          In determining whether a claim has been proven

15  by a preponderance of the evidence, you may consider the

16  testimony of all witnesses regardless of who may have

17  called them and all the exhibits received in evidence

18  regardless of who may have presented them.  A

19  preponderance of the evidence means the greater weight of

20  the evidence.  It refers to the quality and persuasiveness

21  of the evidence, not to the number of witnesses or

22  documents presented.

23          Some of you may have heard of proof beyond a

24  reasonable doubt, which is the proper standard of proof in

25  a criminal trial.  That requirement does not apply to a

1    civil case such as this, and you should not consider or

2    discuss that standard in your deliberations.

3              This case involves four different defendants,

4    and the plaintiff has made multiple claims against each of

5    the defendants.  Although the defendants in this trial are

6    being represented by the same counsel, you are not to

7    treat them as one party.  The fact that there are four

8    defendants does not mean that if one defendant is liable

9    to the plaintiff, the other defendants are also liable.

10   Each defendant is entitled to fair consideration of the

11   plaintiff's claims against that defendant.  All

12   instructions I give you govern the case with respect to

13   the plaintiff's claims against each individual defendant.

14             I may at times refer to what the plaintiff must

15   prove in order to prevail on his claim against the

16   defendants.  Remember that you must decide each element of

17   each claim by the plaintiff against each individual

18   defendant.  It is possible for you to find that the

19   plaintiff has proven a claim against one defendant but not

20   another, but you may not find one defendant liable solely

21   based on your finding that a different defendant is

22   liable.

23             Similarly, even though the plaintiff asserts

24   more than one claim against each defendant, you must

25   consider each claim separately.  You may find that the

1    plaintiff has proven one claim against a specific

2    defendant even if you find that he has not proven another

3    claim brought against that same defendant.

4         I'm now going to discuss the issues and claims

5    in this case.  First off, it is important to distinguish

6    between liability and damages.  When I use the word

7    "liability," I mean the legal obligation that a defendant

8    has allegedly violated with respect to a plaintiff.  This

9    is different than damages, which are monies awarded to

10   compensate a plaintiff for any harms caused by the conduct

11   of a defendant.  You may not consider the question of

12   damages unless you first determine that a defendant is

13   liable to the plaintiff.  I will instruct you on damages

14   later.  For now please focus your attention only on the

15   plaintiff's claims of liability, which I will discuss now.

16        The plaintiff in this case, Gabriel Gonzalez,

17   alleges that the defendants, Waterbury police officers

18   Timothy Jackson, Jason Lanoie, Richard Hamel and Maximo

19   Torres used excessive force against him and/or failed to

20   intervene to prevent the use of excessive force by others

21   after taking Gonzalez into custody on August 7, 2010.

22   Gonzalez claims he sustained personal injuries and damages

23   as a result of claimed violations of his constitutional

24   rights.  Gonzalez has also asserted a claim for

25   intentional infliction of emotional distress.  Gonzalez

1    seeks money damages.  Each defendant officer denies the

2    allegations against him and asserts that his actions were

3    objectively reasonable under the circumstances.

4         I will now address the plaintiff's claims

5    individually.  Mr. Gonzalez raises claims under Title 42

6    United States Code Section 1983, often referred to simply

7    as Section 1983.  Section 1983 permits a person to seek

8    money damages against anyone who, under the authority of

9    state law, deprives that person of rights protected by the

10   Constitution or laws of the United States.  Specifically,

11   Section 1938 provides:  "Every person who, under color of

12   any statute of any state, subjects or causes to be

13   subjected any citizen of the United States to the

14   deprivation of any rights, privileges or immunities

15   secured by the Constitution and laws shall be liable to

16   the party injured in an action at law."

17        Mr. Gonzalez has brought Section 1983 claims

18   against Richard Hamel, Jason Lanoie, Maximo Torres and

19   Timothy Jackson to obtain redress for what he contends

20   were violations of his rights under the Fourth Amendment

21   of the United States Constitution.  The Fourth Amendment

22   reads:  "The right of the people to be secure in their

23   persons, houses, papers and effects against unreasonable

24   searches and seizures shall not be violated."  In order to

25   prevail on his claims under Section 1983, Mr. Gonzalez

1   must establish each of the following three elements:  One,

2   that the defendants acted under color of state law; two,

3   that at least one of the defendants deprived Mr. Gonzalez

4   of a right protected by the Constitution or laws of the

5   United States; and 3, that the defendant's acts that

6   violated Mr. Gonzalez's constitutional rights proximately

7   caused injury to Mr. Gonzalez.

8           In order to prove the first element of a Section

9   1983 claim, Mr. Gonzalez must prove that the defendants

10  were acting under the color of legal authority, in this

11  case the authority of the City of Waterbury.  Acting under

12  color of law simply means that the activities at issue

13  occurred while the defendants were performing official

14  duties.  No one disputes that the defendants were acting

15  under the color of law in this case.  Therefore, the first

16  element of Mr. Gonzalez's Section 1983 claim has been

17  established by agreement of the parties.

18          Mr. Gonzalez must prove that he was deprived of

19  a protected -- let me back up because there's -- under the

20  second element we have a subheading.  The first subheading

21  is excessive force.

22          Mr. Gonzalez must prove that he was deprived of

23  a right protected by the Constitution or laws of the

24  United States.  In this case, Mr. Gonzalez alleges that

25  one or more of the defendants subjected him to excessive

1   force in violation of the Fourth Amendment to the United

2   States Constitution.   The Fourth Amendment to the United

3   States Constitution protects persons from being subjected

4   to excessive force during the course of an arrest.   In

5   other words, law enforcement officials may employ only the

6   amount of force reasonably necessary under the

7   circumstances.

8          Mr. Gonzalez alleges that the defendants

9   violated his constitutional right by using excessive force

10   during his arrest.   Mr. Gonzalez claims that he was

11   subjected to excessive force by the defendants when they

12   threw rocks at him prior to taking him into custody and

13   when they punched and kicked him after removing him from

14   the drainage ditch.   Each defendant denies ever throwing

15   rocks at Mr. Gonzalez and further denies that any officer

16   punched and/or kicked Mr. Gonzalez after his apprehension.

17   Mr. Hamel and Mr. Lanoie admit to using force on

18   Mr. Gonzalez, but argue that their respective use of force

19   was reasonable under the circumstances presented to them.

20          To determine whether the defendant's acts during

21   the course of the arrest caused Mr. Gonzalez to suffer the

22   loss of a federal right, you must determine whether the

23   amount of force used to restrain Mr. Gonzalez was that

24   which a reasonable officer would have employed under

25   similar circumstances.   The test is not whether the

1    defendants thought their use of force was reasonable;

2    rather, it is an objective standard.  Would a reasonably

3    competent police officer consider the amount of force used

4    by each defendant reasonable under the circumstances at

5    the time the force was used?  Our Fourth Amendment

6    jurisprudence has long recognized that the right to

7    execute an arrest necessarily carries with it the right to

8    use some degree of physical coercion or threat of such

9    coercion to restrain a person.  Thus, police officers are

10   justified in using reasonable physical force upon another

11   person when, and to the extent that, they reasonably

12   believe it is necessary to restrain or detain a person,

13   effect an arrest or defend themselves or a third person

14   from the use or imminent use of physical force.

15           Determining whether the force used to effect a

16   particular seizure is reasonable under the Fourth

17   Amendment requires a careful balancing of the nature and

18   quality of the alleged intrusion on the individual's

19   Fourth Amendment interests against the importance of the

20   governmental interests alleged to justify the intrusion.

21   Because the test of reasonableness under the Fourth

22   Amendment is not capable of precise definition or

23   mechanical application, its proper application also

24   requires careful attention to the facts and circumstances

25   of each particular case.

1          In making this determination, you may take into

2     account such factors as whether Mr. Gonzalez posed an

3     immediate threat to the safety of the defendants or

4     others, whether Mr. Gonzalez was actively resisting

5     restraint or attempting to evade restraint, the severity

6     of the criminal conduct at issue, the need for and

7     duration of force, the relationship between that force and

8     the extent of the injury that was inflicted upon

9     Mr. Gonzalez by the defendants, and any efforts made to

10    temper the severity of a forceful response.

11         You must also keep in mind that not every push

12    or shove, even if it may later seem unnecessary in the

13    presence of the courtroom, violates the Fourth Amendment.

14    The calculus of reasonableness must allow for the fact

15    that police officers are often forced to make split-second

16    judgments in circumstances that are tense, uncertain and

17    rapidly evolving about the amount of force that is

18    necessary in a particular situation.  The reasonableness

19    of a particular use of force must be judged from the

20    perspective of a reasonable police officer on the scene,

21    rather than the view of 20/20 hindsight.

22         You do not have to determine whether there were

23    less intrusive ways for the defendants -- excuse me, let

24    me read that again.  You do not have to determine whether

25    there were less intrusive ways that the defendants could

1   have restrained Mr. Gonzalez.  A police officer is not

2   required to use the least restrictive means or the least

3   force possible as long as the force used is reasonable.

4   The Constitution merely requires that, whatever degree of

5   force a police officer chooses to use, the use of force be

6   objectively reasonable under the totality of the

7   circumstances.  However, the fact that a police officer is

8   entitled to use some force in a particular circumstance

9   does not mean that he may use unlimited amounts of force.

10  A law enforcement officer may only use the amount of force

11  that is objectively reasonable under the circumstances to

12  the accomplish the officer's legitimate law enforcement

13  objectives, including the apprehension of criminal

14  suspects, self-protection or protection of others.  In

15  determining whether an officer's use of force is

16  objectively reasonable, you must view the circumstances

17  with which the officer was confronted through the eyes of

18  a reasonable and cautious police officer on the scene.

19          Mr. Gonzalez has the burden of establishing, by

20  a preponderance of the evidence, that a defendant used

21  excessive force against him during the course of his

22  apprehension.  The fact that the plaintiff is unable to

23  recognize and/or name any specific defendant does not

24  prohibit you from finding that a particular defendant

25  performed a particular action.  Rather, if you find that

1   the evidence prompts you to do so, you may infer that a

2   particular defendant performed a particular action based

3   on other evidence in the record.

4          If you determine that any of the defendants' use

5   of force was unreasonable, you must hold that defendant

6   liable.  If you find that a defendant used reasonable

7   force under the circumstances, then that defendant did not

8   violate the Fourth Amendment, and your verdict must be in

9   favor of that defendant.  Remember, this determination

10  must be made on an individual basis, and you must consider

11  whether each of the defendants' use of force was

12  reasonable or unreasonable.

13         The second subpart here is failure to intervene.

14  Police officers have an affirmative duty to enforce the

15  law and preserve the peace.  This duty includes stopping

16  other police officers from violating someone's

17  constitutional rights.  A police officer may not ignore

18  the duty imposed by his office and fail to stop other

19  officers who violate the constitutional rights of a third

20  person in his presence.

21         In this case Mr. Gonzalez alleges that the

22  defendants failed to intervene to prevent the unreasonable

23  use of force against him.  Thus, if you find that one

24  defendant used excessive force against Mr. Gonzalez and

25  that another of the defendants observed or had reason to

1   know of this constitutional violation and was in a

2   position to and had the ability to stop the use of

3   excessive force but did not do so, you may hold that other

4   defendant liable for the excessive force if that

5   defendant's failure to intervene was a proximate cause of

6   Mr. Gonzalez's injuries.

7           In order to prove the third element of a Section

8   1983 claim, Mr. Gonzalez must prove that one of the

9   defendants committed acts that were the proximate cause of

10  his injuries.  Under Section 1983, a defendant is

11  responsible for the natural consequences of his actions.

12  An act is a proximate cause if it was a substantial factor

13  in bringing about the plaintiff's injury.  You must

14  determine whether injury or damage suffered by the

15  plaintiff was a reasonably foreseeable consequence of the

16  defendant's conduct.  An injury that is a direct result or

17  a reasonably probable consequence of a defendant's conduct

18  was proximately caused by that conduct.  The issue is

19  whether a reasonable person would view the defendant's

20  conduct as the cause of the plaintiff's injuries.  This

21  does not mean that the law recognizes only one proximate

22  cause of an injury, consisting of only one factor or

23  thing, or the conduct of only one person.  On the

24  contrary, many factors or things or the conduct of two or

25  more persons may operate at the same time, either

 1   independently or together, to cause injury, and in such a

 2   case each may be a proximate cause.  If you find that

 3   Mr. Gonzalez has proven by a preponderance of the evidence

 4   that a defendant's proximate -- that a defendant's conduct

 5   proximately caused an injury suffered by him, then

 6   Mr. Gonzalez has proven the third and final element of a

 7   Section 1983 claim with respect to that defendant.  If you

 8   find that Mr. Gonzalez complains about an injury that was

 9   not proximately caused by a defendant's conduct, you may

10   not find that defendant liable for that injury.

11           Mr. Gonzalez must prove that the defendants'

12   acts -- defendants acted intentionally or recklessly, mere

13   negligence is not enough, but he does not need to prove

14   that the defendants acted with specific intent to violate

15   his federally protected rights.  An act is intentional if

16   it is done voluntarily and deliberately, not because of

17   mistake, accident, negligence or other innocent reason.

18   An act is reckless if done in conscious disregard of its

19   known probable consequences.  In other words, even if a

20   defendant did not intentionally seek to deprive a

21   plaintiff of the plaintiff's rights, if nevertheless he

22   purposely disregarded the high probability that his

23   actions would deprive the plaintiff of the plaintiff's

24   rights, then the second essential element would be

25   satisfied.

1            I have concluded my instruction on

2    Mr. Gonzalez's claims under Section 1983 and will now

3    instruct you on his state law claim.  Mr. Gonzalez's only

4    state law claim is an allegation of intentional infliction

5    of emotional distress.  Mr. Gonzalez alleges that the

6    defendants intentionally inflicted emotional distress upon

7    him in violation of Connecticut law.

8            To succeed on a claim for intentional infliction

9    of emotional distress, a plaintiff must prove each of the

10   following four elements:  One, a defendant intended to

11   inflict emotional distress or knew or should have known

12   that emotional distress was a likely result of his

13   conduct; two, the defendant's conduct was extreme and

14   outrageous; three, the defendant's conduct caused the

15   plaintiff's distress; and four, the plaintiff's emotional

16   distress was severe.

17           The first element of Mr. Gonzalez's claim

18   against each individual defendant is that the defendant

19   intended to inflict emotional distress upon him or knew or

20   should have known that emotional distress was the likely

21   result of his conduct.  With respect to each defendant,

22   Mr. Gonzalez bears the burden of proving, by a

23   preponderance of the evidence, that the particular

24   defendant either intended to inflict emotional distress on

25   him, knew that emotional distress was the likely result of

1   his conduct or should have known that emotional distress

2   was the likely result of his conduct.  An actor should

3   have known the likely consequences of his conduct if a

4   person of reasonable prudence or intelligence would have

5   ascertained those consequences were likely to result.

6          It is important for you to keep in mind that

7   intent is not the same thing as negligence.  In the law,

8   negligence means failure to exercise the care that a

9   reasonably prudent person would exercise under the

10  circumstances.  To find that any individual defendant

11  intended to inflict emotional distress on Mr. Gonzalez,

12  you must find that the individual defendant did more than

13  just act carelessly or imprudently with regard to the

14  possibility that his conduct would inflict emotional

15  distress on Mr. Gonzalez.  You must find that the

16  individual defendant actually intended to cause

17  Mr. Gonzalez emotional distress through his conduct, knew

18  that the conduct was likely to cause emotional distress,

19  or knew or should have known that the conduct was likely

20  to cause emotional distress.

21          In examining Mr. Gonzalez's claims, bear in mind

22  that outrageous conduct is that which exceeds all bounds

23  usually tolerated by a decent society.  Mere insults,

24  indignities or annoyances that are not extreme and

25  outrageous will not suffice.  Rather, a defendant's

1    conduct must have been so outrageous in character and so

2    extreme in degree as to go beyond all possible bounds of

3    decency and to be regarded as atrocious and utterly

4    intolerable in a civilized community.  Thus, for

5    Mr. Gonzalez to prevail, he must show that the defendant's

6    conduct against him was of a nature that is especially

7    calculated to cause and does cause mental distress of a

8    very serious kind.

9         If you find that Mr. Gonzalez has established,

10   by a preponderance of the evidence, each of the four

11   elements that I described, you should enter a verdict in

12   favor of him for any defendant for which you have found

13   liability.  If you find that Mr. Gonzalez has not proven

14   any one of the elements of the claim, then you should

15   enter a verdict in favor of the defendants on that claim.

16        For each of the claims I have just described, if

17   you find that Mr. Gonzalez has proven each required

18   element by the required standard of proof, then you can

19   find for Mr. Gonzalez.  If you find that Mr. Gonzalez has

20   failed to prove one or more elements of any claim with

21   respect to any one of the defendants, then you must find

22   for the relevant defendant on that claim.

23        I will now instruct you on damages.  If, after

24   deliberating, you decide that Mr. Gonzalez has proven one

25   or more of his claims, you should turn to the issue of

1    damages.  The fact that I charge you on the law concerning

2    damages should not be taken as a suggestion that you

3    should necessarily reach the question of damages.  It is

4    your function to decide the issue of liability.  I am

5    instructing you on the elements of damages only so that

6    you will have guidance if you decide that the plaintiff is

7    entitled to recover damages on any of his claims.  You

8    should not consider the question of damages unless and

9    until you find that at least one of the defendants is

10   liable to the plaintiff.  You should award damages only

11   for those injuries caused by the conduct you find

12   satisfies the elements of Section 1983 or intentional

13   infliction of emotional distress in accordance with these

14   instructions.

15            The first type of damages Mr. Gonzalez claims is

16   compensatory damages.  The purpose of compensatory damages

17   is to award as far as possible fair and just compensation

18   for the plaintiff's losses.  If you decide for the

19   plaintiff on the issue of liability on any claim, you must

20   then fix the amount of damages that will reasonably and

21   fairly compensate the plaintiff for any harm brought about

22   by the defendant's actions or inactions that give rise to

23   liability on that claim.  These damages are known as

24   compensatory damages.  Compensatory damages seek to make

25   the plaintiff whole, that is, to compensate for the losses

1   or injuries suffered.  The rule is that the plaintiff is

2   to be awarded fair and just compensation for proven losses

3   or injuries.

4        There are two types of compensatory damages,

5   economic and noneconomic.  Economic damages are

6   compensation for pecuniary losses, which may include money

7   actually spent or debts incurred as a result of the injury

8   and/or medical bills and expenses.  Noneconomic damages,

9   on the other hand, provide compensation for all

10  nonpecuniary losses, including physical, mental and

11  emotional pain and suffering, humiliation, injury to

12  reputation, embarrassment, fear, anxiety and/or anguish.

13       Generally speaking, in order to award

14  compensatory damages for a given injury or harm, you must

15  find that the plaintiff has proven by a preponderance of

16  the evidence that the claimed injury or harm was caused by

17  a given defendant.  The plaintiff may recover fair,

18  reasonable and just compensation for only those damages he

19  has proven were caused by the acts of the defendants that

20  satisfy the elements of the plaintiff's claim.  Actual

21  damages must not be based on speculation or sympathy.

22  Damages must be based on the evidence at trial.  On the

23  other hand, the law does not require the plaintiff to

24  prove the amount of his losses with mathematical precision

25  but only with as much definiteness and accuracy as the

1   circumstances permit.  You should award damages to the

2   extent that the loss or injury can be reasonably

3   quantifiable and not simply on the basis of the inherent

4   value of the rights violated.  The damages you should

5   award should be proportional to the actual loss sustained,

6   whether that loss is physical, mental or emotional or one

7   of the other types of loss I have mentioned.

8         Just as the plaintiff has the burden of proving

9   liability, the plaintiff also has the burden of proving

10  his entitlement to recover damages by a preponderance of

11  the evidence.  The evidence must give you a sufficient

12  basis to estimate the amount of damages to a reasonable

13  probability.  Although damages may be based on reasonable

14  and probable estimates, you may not award damages on the

15  basis of guesswork, speculation or conjecture.  You must

16  bear in mind at all times that the burden is on

17  Mr. Gonzalez to prove that any claimed element of damages

18  was a proximate consequence of a proven unlawful act, as

19  well as to prove the reasonable amount with respect to any

20  such element of damage.

21        In order for a defendant to be held liable for

22  the use of excessive force, Mr. Gonzalez must establish

23  the defendant was personally involved in the use of

24  excessive force or that he failed to intervene in the

25  other officers' use of excessive force.  Proof of an

1    individual defendant's personal involvement in the alleged

2    wrong is required in order to hold him liable for damages.

3    However, if Gonzalez establishes that multiple defendants

4    are responsible for a particular use of excessive force,

5    it is not his burden to establish which particular officer

6    is liable for which harm.  If multiple defendants used

7    excessive force but less than all of them caused the harm,

8    it is each defendant's burden to prove that he was not the

9    but for cause of the harm.  For example, if you find that

10   Gonzalez was unreasonably punched and kicked in the head

11   and torso by multiple officers, Gonzalez does not need to

12   prove which officers dealt the blow to the head and which

13   struck Gonzalez's torso.  That said, you must still

14   consider each defendant's liability on an individual

15   basis.

16          Nominal damages are awarded as recognition that

17   a plaintiff's rights have been violated.  In the event

18   that Mr. Gonzalez has proven that one or more defendants

19   violated his constitutional rights, but you find that he

20   has proven no injury or that you are unable to calculate

21   damages to compensate for that injury, you should award

22   Mr. Gonzalez nominal damages.  You should also award

23   nominal damages if, upon finding that some injury resulted

24   from a given unlawful act, you find that you are unable to

25   compute monetary damages except by engaging in speculation

1    or guesswork.  You may not award Mr. Gonzalez both nominal

2    and compensatory damages.  Either he was measurably

3    injured, in which case you should award compensatory

4    damages, or he was not or you cannot reasonably calculate

5    such damage, in which case you should award nominal

6    damages.

7              If you find that Mr. Gonzalez has proven that a

8    defendant violated his rights and you award compensatory

9    or nominal damages to him for any such claim, then you

10   must decide whether Mr. Gonzalez is entitled to an award

11   of punitive damages.  The law permits you, the jury, to

12   award punitive damages in order to punish a wrongdoer for

13   some extraordinarily wrongful conduct and to serve as a

14   warning to others not to engage in such conduct.  Whether

15   you decide to award any punitive damages is entirely

16   within your discretion.  In making this decision, you

17   should consider the underlying purpose of punitive

18   damages.  Punitive damages, when appropriate, are intended

19   to protect the community and to be an expression of the

20   jury's indignation at a defendant's misconduct.  Moreover,

21   punitive damages are intended to deter a defendant and

22   others like him from taking similar actions in the future.

23   Whether you decide to award punitive damages against a

24   defendant should be based on whether you find that he

25   acted maliciously or wantonly with respect to

1    Mr. Gonzalez's rights.  An act is malicious if it is done

2    with ill will or out of spite.  An act is wanton if it is

3    done with reckless or callous disregard of, or reckless or

4    callous indifference to, the rights of the injured person.

5    A defendant's maliciousness or wantonness can be inferred

6    from his conduct.  If Mr. Gonzalez has proven to you that

7    a defendant's conduct was malicious or wanton, then you

8    may award punitive damages against that defendant.

9         If you find a defendant liable for punitive

10   damages, then it is within your discretion to determine

11   the amount you award as punitive damages.  The extent to

12   which you award punitive damages should be informed by the

13   purposes underlying punitive damages; that is, in fixing

14   the sum to be awarded, you should consider the degree to

15   which a defendant should be punished for wrongful conduct

16   and the degree to which an award of one sum or another

17   will deter persons like him from committing malicious or

18   wanton acts in the future.

19        Please keep in mind that punitive damages should

20   be awarded only if you find Mr. Gonzalez has proven

21   malicious or wanton conduct on a particular defendant's

22   part.  You should determine the amount of punitive damages

23   separately for each individual defendant that Mr. Gonzalez

24   has proven liable.  You should use calm judgment in

25   analyzing the facts and deciding whether to award punitive

1    damages.

2         The plaintiff cannot recover more than once for

3    the same loss, even if he prevails on two or more causes

4    of action.  I have provided you with a verdict form that

5    includes instructions in italics to help guide you and

6    avoid an inconsistent or duplicative award.  Please follow

7    those instructions carefully.

8         Next I want to discuss with you generally what

9    we mean by evidence and how you should consider it.  The

10   evidence from which you are to decide what the facts are

11   comes in one of three forms.  First, there is the sworn

12   testimony of witnesses, both on direct examination and

13   cross-examination and regardless of who called the

14   witness; second, there are the exhibits that have been

15   received into the trial record; and third, there are any

16   facts to which all the lawyers have agreed or stipulated

17   or that I have directed you to find, for example, by

18   taking judicial notice of a fact.

19        The evidence in this case is the sworn testimony

20   of the witnesses, the exhibits received in evidence and

21   the stipulations.  Questions are not evidence; answers

22   are.  At times a lawyer may have incorporated into a

23   question a statement that assumes certain facts to be true

24   and asked the witness if the statement was true.  If the

25   witness denied the truth of a statement and if there is no

1    evidence in the record proving that assumed fact to be

2    true, then you may not consider it to be true simply

3    because it was contained in the lawyer's question.

4           Testimony that has been stricken or excluded by

5    the Court also is not evidence and may not be considered

6    by you in rendering your verdict.  Further, if certain

7    testimony was received for a limited purpose, you must

8    follow the limiting instructions I've given you for that

9    testimony.  What the lawyers said in their opening

10   statements, what they will say in the closing arguments

11   and what they said in the comments, objections and

12   questions is not evidence.  What they say in their closing

13   arguments is intended to help you understand the evidence

14   and to reach your verdict.  If your recollection of the

15   facts differs from the lawyer's statements, however, you

16   should rely on your own memory.  Moreover, what I may have

17   said during the trial or what I may say in these

18   instructions is not evidence, and my rulings on the

19   admissibility of evidence do not indicate any opinion

20   about the weight or effect of such evidence.

21          Exhibits that have been marked for

22   identification may not be considered by you as evidence

23   unless and until they have been received into evidence by

24   the Court.  Exhibits were received into evidence when I

25   said an exhibit was admitted as a full exhibit.  In

1    addition, materials used only to refresh a witness's

2    recollection or to demonstrate or help explain testimony

3    are not evidence unless they are admitted as full

4    exhibits.  It is for you alone to decide the weight, if

5    any, to be given to the testimony you have heard and the

6    exhibits you have seen.

7              There are two general types of evidence that you

8    may properly use in reaching your verdict.  One type of

9    evidence is direct evidence.  Direct evidence includes a

10   witness's testimony about something the witness knows by

11   virtue of his or her own senses on something he or she has

12   seen, felt, touched, heard or done.  Circumstantial

13   evidence is evidence that tends to prove a disputed fact

14   by proof of other facts.  For example, assume that when

15   you came into the courthouse this morning, the sun was

16   shining and it was a nice day.  Assume that because there

17   are no windows in this courtroom, you could not look

18   outside.  As you were sitting here, someone walked in with

19   an umbrella that was dripping wet.  Then a few minutes

20   later another person also entered with a wet umbrella.

21   Now, you cannot look outside the courtroom and you cannot

22   see whether or not it's raining, so you have no direct

23   evidence of that fact.  But on the combination of facts

24   that I've asked you to assume, it would be reasonable and

25   logical for you to conclude that it had been raining.

 1    That is all there is to circumstantial evidence.  On the

 2    basis of your reason, experience and common sense you

 3    infer from one established fact the existence or

 4    nonexistence of some other fact.  Circumstantial evidence

 5    is of no less value than direct evidence.  It is a general

 6    rule that the law makes no distinction between direct and

 7    circumstantial evidence but simply requires that your

 8    verdict must be based on the preponderance of all the

 9    evidence presented.  Circumstantial evidence, however,

10    does not include guesswork or conjecture.  Circumstantial

11    evidence consists only of the reasonable and logical

12    inferences that you draw from other evidence in the

13    record.

14          During the trial, you may have heard the

15    attorneys use the word "inference," and in their arguments

16    they may ask you to infer, on the basis of your reason,

17    experience and common sense, from one or more facts the

18    existence of some other fact.  An inference is not a

19    suspicion or a guess.  It is a reasoned, logical

20    conclusion that a disputed fact exists because another

21    fact has been shown to exist.  There are times when

22    different inferences may be drawn from the same facts,

23    whether proved by direct or circumstantial evidence.  The

24    plaintiff may ask you to draw one set of inferences, while

25    the defendants may ask you to draw another.  It is for you

1   and you alone to decide what inferences you will draw.

2          The process of drawing inferences from facts in

3   evidence is not a matter of guesswork or speculation.  An

4   inference is a conclusion that you are permitted but not

5   required to draw from the facts that have been established

6   by either direct or circumstantial evidence.  In drawing

7   inferences, you should exercise your common sense.

8   Finally, you may not draw any inferences from the mere

9   fact that this lawsuit was filed.

10          You have had the opportunity to observe all of

11  the witnesses.  It is now your job to decide how

12  believable each witness was in his or her testimony.  You

13  are the sole judges of the credibility of each witness and

14  of the importance of his or her testimony.  In making

15  these judgments, you should carefully scrutinize all the

16  testimony of each witness, the circumstances under which

17  each witness testified and any other matters and evidence

18  that may help you decide the truth and importance of each

19  witness's testimony.

20          How do you determine truthfulness?  You base it

21  on what you have seen and heard.  You watch the witness

22  testify.  Everything a witness said or did on the witness

23  stand counts in your determination.  How did the witness

24  impress you?  Was he or she frank, forthright and candid

25  or evasive and edgy as if hiding something?  How did the

1    witness appear?  What was his or her demeanor, that is,

2    their appearance -- excuse me -- behavior and manner while

3    testifying.  Often it is not what a person says but how he

4    or she says it that convinces us.

5          You should use all the tests for truthfulness

6    that you would use in determining matters of credibility

7    in your everyday lives.  You should consider any bias or

8    hostility the witness may have shown for or against any

9    party as well as any interest the witness has in the

10   outcome of the case.  You should consider the opportunity

11   the witness had to see, hear or know the things about

12   which he or she testified, the accuracy of the witness's

13   memory, candor or lack of candor, intelligence, the

14   reasonableness and probability of the witness's testimony,

15   its consistency or lack of consistency and its

16   corroboration or lack of corroboration with other credible

17   evidence.  Always remember that in assessing a witness's

18   testimony you should use your common sense, your good

19   judgment and your own life experiences.

20         You have heard testimony from witnesses who have

21   testified by video from a remote location.  The fact that

22   certain witnesses testified remotely should not affect

23   your consideration of their testimony.  You should treat

24   each witness's testimony the same as if that witness had

25   testified in court.  You should recall their demeanor on

1   the stand, their manner of testifying and the substance of

2   their testimony, and you should weigh and balance it just

3   as carefully as you would the testimony of any other

4   witness.

5           You have heard testimony from police officers in

6   this case.  The testimony of a police officer is entitled

7   to no greater or lesser weight than any other witness.  An

8   officer who takes the witness stand subjects his testimony

9   to the same examination and the same tests that any other

10  witness does, and in the case of police officers you

11  should not believe or disbelieve them merely because they

12  are employed as officers.  You should recall their

13  demeanor on the stand, their manner of testifying and the

14  substance of their testimony, and you should weigh and

15  balance it just as carefully as you would the testimony of

16  any other witness.  People employed by the government,

17  including police officers, do not stand in any higher or

18  lower station in the community than other persons, and

19  their testimony is not entitled to any greater or lesser

20  weight.

21          During the trial, you heard testimony from

22  expert witnesses.  Witnesses who are called experts are

23  permitted to express opinions on matters about which they

24  have special knowledge and training.  Expert testimony is

25  presented to you on the theory that it may be of some

1    assistance to you in understanding the evidence or in

2    reaching an independent decision on the facts.  In

3    weighing an expert's testimony, you may consider the

4    expert's qualifications, opinions, reasons for testifying

5    and any of the other considerations that ordinarily apply

6    when you are deciding whether or not to believe a

7    witness's testimony.  You may give the expert's testimony

8    whatever weight, if any, you find it deserves in light of

9    all the evidence in this case.  You should not, however,

10   accept the expert's testimony merely because he or she is

11   called as an expert, nor should you substitute expert

12   testimony for your own reason, judgment and common sense.

13   The determination of facts in this case rests solely with

14   you.

15          A witness may be discredited or impeached by

16   contradictory evidence, by a showing that the witness

17   testified falsely concerning a material matter or by

18   evidence that at some other time the witness said or did

19   something inconsistent with the witness's present

20   testimony.  It is your exclusive province to give the

21   testimony of each witness such credibility or weight, if

22   any, as you think it deserves.  If a witness testified

23   untruthfully in some respect, you may consider that fact

24   in deciding the weight you will give to that witness's

25   testimony.  Considering that fact and all other relevant

1    evidence, you may accept or reject the testimony of each

2    witness either in whole or in part.

3           You are not required to accept testimony even

4    though the testimony is uncontradicted and the witness is

5    not discredited or impeached.  You may decide, because of

6    the witness's manner and demeanor, the improbability of

7    his or her testimony or other reasons that such testimony

8    is not worthy of belief.  On the other hand, the testimony

9    of a single witness may be enough to convince you of a

10   fact in dispute if you believe that the witness has

11   truthfully and accurately related what, in fact, occurred.

12          I must add a few general instructions concerning

13   your deliberations.  You were permitted to take notes

14   during the course of the trial.  Any notes you have taken

15   should be used only as memory aids.  Do not give your

16   notes more importance than your independent recollection

17   of the evidence.  If you did not take notes, you should

18   rely on your own memory of the proceedings and should not

19   be unduly influenced by the notes of other jurors.  The

20   fact that a particular juror has taken notes entitles that

21   juror's opinions to no greater weight than those of any

22   other juror, and your notes are not to be shown to any

23   other juror during the course of deliberations.

24          Your verdict must be based solely upon the

25   evidence developed at this trial or the lack of evidence.

1    Please bear in mind that all litigants are equal before

2    the law.  You should not, therefore, consider any personal

3    feelings you might have about the race, religion, national

4    origin, sex, age, wealth, lifestyle or other features of

5    the parties.  Similarly, it would be wrong for you to

6    allow feelings you might have about the nature of the

7    claims against the defendants to influence you in any way.

8    You have been chosen to try the issues of fact and reach a

9    verdict on the basis of the evidence presented here.  If

10   you let sympathy or prejudice interfere with your clear

11   thinking about the facts, there is a risk that you will

12   not arrive at a just verdict.

13            In reaching your verdict, you are not to be

14   affected by sympathy for or prejudice against any of the

15   parties.  You are not to be affected by what the reaction

16   of the parties or the public to your verdict may be,

17   whether it will please or displease anyone, be popular or

18   unpopular, or indeed any consideration outside the case as

19   it has been presented to you in this courtroom.

20   Similarly, it would be wrong for you to allow feelings you

21   might have about the nature of the claims against the

22   defendants to influence you in any way.  Finally, each of

23   the parties to this case must be regarded as equals by

24   you.

25            At this point we will interrupt the instructions

```
 1    to hear closing arguments of counsel.  I will conclude the
 2    instructions after those summations.  Remember, what the
 3    lawyers say in closing arguments is not evidence but is
 4    merely argument about what the evidence shows.
 5            Now, ladies and gentlemen, I expect that the
 6    closing arguments here may take up to an hour and a half,
 7    so I'm going to give you the opportunity, if anybody
 8    thinks they would like to have a restroom break before we
 9    begin that process, this would be a good time to do that.
10    Anybody feel like that might be a good idea?  Yes?  Okay.
11            Why don't we take a short break, say about five
12    minutes, and we'll bring you back out to hear the
13    closings.  Thank you.
14            (Jury exits courtroom.)
15            THE COURT:  Let me hear any objection to the
16    charge as delivered.  You don't have to restate objections
17    you made previously, but if I said something wrong or got
18    something wrong, let me know now.
19            MR. CREED:  No, Your Honor, the plaintiff is
20    fine.
21            MR. MENGACCI:  No, Your Honor.
22            THE COURT:  Okay.  So, Mr. Creed, why don't you
23    get ready to go.
24            MR. MENGACCI:  Your Honor, may I use the
25    restroom?
```

1               THE COURT:  Of course.

2               (Recess:  10:21 a.m. - 10:27 a.m.)

3

4               THE COURT:  Mr. Creed, it sounds like Mr.

5   Mengacci wants to turn the podium during his closing.  I

6   don't know if you want to turn it now.  What I was going

7   to say is, you need to get your demonstrative stands out

8   of the way before he -- so at the end of your closing,

9   just move the demonstratives out of the way so he's not

10  having to deal with that.

11              MR. CREED:  I can move it now.  I just don't

12  want to break the cords.

13              THE COURT:  Mike will do it.

14              MR. CREED:  Another notation on the resumé.

15              THE COURT:  All right.  Mr. Mengacci, are you

16  happy with that placement?

17              MR. MENGACCI:  Yes, Your Honor, that's fine.

18  Thank you.

19              THE COURT:  Mr . Creed, I still want you to move

20  your demonstratives out of the way when you're done, all

21  right?

22              MR. CREED:  Yes, Your Honor.

23              THE COURT:  Everybody set?  All right.  Let's

24  bring the jury in, please.

25              (Jury enters courtroom.)

1          THE COURT:  Welcome back, ladies and gentlemen.

2     We're now going to have closings, starting with the

3     plaintiff.

4          MR. CREED:  May it please the Court, Counsel.

5     Good morning, ladies and gentlemen.

6          We've come to the end of the trial, and on

7     behalf of my client, Gabriel Gonzalez, we'd like to thank

8     you for the time and attention you've put in this case.

9     We've watched you, as you have been watching us, and you

10    really have paid attention to the evidence, and it's great

11    to see a jury engaged and taking an interest in a case and

12    gathering all the information that's put out there.  And

13    we appreciate all the time and effort you've put into

14    this.

15         This is not a case against the police in

16    America.  This is not a case against those brave men and

17    women across the country.  We have millions of police

18    officers in this state -- in this country.  Every night

19    they make thousands of arrests properly and in the

20    appropriate way.  You don't see the injuries that you saw

21    in this case too often, thankfully.  This is a case about

22    these officers and what they did in the early morning

23    hours of August 7, 2010.

24         They were in Newington.  They saw my client hop

25    the fence, and they decided to effect the arrest.  My

1    client was wrong to run from the police.  He admits that,

2    he was wrong to run, but he wanted to give up, and that's

3    when this horrific and terrible thing took place.

4           Police officers in this country enjoy a unique

5    position in that they have the power of life and death

6    over all of us.  And when you're alone in the woods, in a

7    dark place, you know, think back, they always say, I think

8    Mark Twain said, You know the character of a person when

9    they're in the room alone.  So here they were in

10   Newington.  They surrounded my client.  They were the

11   police officers empowered with all the authority that we

12   grant police officers, and yet he ended up with a

13   traumatic brain injury, his face crushed in, one eye he's

14   blind, in his left eye for the rest of his life.  He's

15   going to have to battle the brain injury, the traumatic

16   brain injury for the rest of his life.  Sure, the doctor

17   talked about medications and that that might help, but

18   whether or not they do help, well, that's life because

19   everybody has uncertain reactions to certain medications.

20   Although the doctor -- if you remember, the doctor did say

21   he'll never recover his visual motor skills, and his

22   visual motor memory will always be bad.  And he has no

23   binocular vision.  I'd like to remind you of the testimony

24   of Dr. Sabherwal, who showed you that this is what he sees

25   out of his left eye (indicating).  Imagine having to wake

1    up every morning and know this is what your day is going

2    to be like out of your left eye and you're straining to

3    see with your right eye, what your night vision is like,

4    your ability to drive, your ability to play with the kids,

5    your ability to get a job, your ability to live a normal

6    life and grow and develop.

7            But imagine that the government did this to you,

8    because those men are agents of the government.  They have

9    a responsibility, just like all of us, to be reasonable in

10   the execution of their duties.  There's no such thing as

11   reasonable excessive force.  It's like a light switch;

12   it's either excessive or it's not.

13           My client had no weapon.  My client posed no

14   threat to them.  You had an area the size from right in

15   front of the bench over to here, and he was in the

16   vicinity of the podium.  You heard the testimony of two of

17   the officers who said they heard him say, Oh, I got him; I

18   got him here; show me your hands; show me your hands; and

19   then they moved forward; they moved in.

20           You remember the testimony of Torres, who said

21   he hopped over the fence and right away he could hear him;

22   he knew where he was.  He couldn't go very far because he

23   couldn't go very far.  He knew he had to be right there.

24   You remember that testimony.  And then Torres says he put

25   the flashlight out to the other side, which, again, is

1    only like from here to there (indicating), and he says,

2    I'm establishing a point, this is the entry point, but

3    then he really didn't get any coordination from the other

4    officers.  His testimony is kind of back and forth on

5    that.  But, in any event, he moved in, and remember his

6    words?  What was his physical condition when we handed him

7    off?  When I left, he grabbed him, they're moving forward,

8    and then he turned around, took a couple steps and moved

9    back.  What was his condition?  Well, he wasn't completely

10   passed out.

11         So was he 80 percent passed out?  I mean, for

12   him to say that, that was his own words, not prompted by

13   me.  He said, He wasn't completely passed out.  That gives

14   you an indication of the force that was used on this kid.

15         What's a great indicator, as an element of

16   proof, for the excessive force that was used?  The Shea

17   incident, the Shea circumstance.  In my mind I went round

18   and round about that issue for a long time because you

19   know we impeached Hamel and one or two of the other

20   officers as well that they gave sworn testimony that Hamel

21   and Jackson had taken Gonzalez from the train tracks up to

22   the cars.  Hamel himself testified three times that he had

23   done that.  So then why change that story after the

24   lawsuit is filed and after discovery has taken place?  Why

25   change that story?  Well, it finally dawned on me.

1    Gonzalez has testified that the two officers who beat him

2    were the ones who picked him up and carried him out to the

3    car and took him back to Waterbury.  So at some point in

4    their mind, to confuse the issue, Shea would say, I'm the

5    one who took him out, casting doubt on Gonzalez's story.

6    It was beyond the two years.  I mean, Shea couldn't be

7    brought into the suit.  I'm not saying that sitting here

8    in the courtroom today it makes logic sense to everyone,

9    but that's why they did -- they changed that.

10            But then there's another bigger element to that.

11   If they felt justified that how they treated him in the

12   drainage ditch was correct, if they felt that, well, how

13   we approached him and how we arrested him in the drainage

14   ditch, that was all reasonable and prudent and within the

15   bounds of what we should be doing, then why change it?

16   Why didn't they just continue to say, Well, yeah, we

17   picked him up --

18            THE COURT:  Mr. Creed, don't get too close.

19            MR. CREED:  Oh, I'm sorry.  Hamel told the truth

20   on three different occasions that he and Jackson took him

21   out, yet when the enormity of how injured he was came to

22   light and the lawsuit came forward, then suddenly it was

23   like, Oh, oh, we've got to -- we've got to do something

24   here.  So then the story changed.  And they lied here to

25   you.  Were they telling the truth back then on three or

1    four occasions they testified that they took him out, or

2    are they lying now?

3              MR. MENGACCI:  Your Honor, I'm going to object.

4    There's no evidence that "they" testified previously to

5    that.  The only evidence is that Hamel testified

6    previously.

7              THE COURT:  Well, okay.  We're not going to

8    fight about that.  The jury will sort that out.

9              MR. CREED:  Okay.  You took great notes.  Review

10   the testimony of Lanoie, review the testimony of Torres,

11   who said he handed him off and he took him out, "he"

12   meaning Hamel took him out, transported him out.  Review

13   your own notes.  You took great -- paid great attention

14   and took your own notes.

15             Now, there's two other very interesting

16   characters in this, in this case, who I think are pretty

17   decent guys, Juan Rivera and Sergeant Angon.  You heard

18   Dr. Dessieux tell you how brutal and horrific those

19   injuries were, so much so that for the first time he

20   actually took pictures of it on the night he treated my

21   client.  He took pictures of it because it was so horrific

22   and so brutal.  He memorialized it by taking a picture.

23   And then a few weeks later he took another couple of

24   pictures so it could help with the surgery.  But that

25   night he took pictures because he was shocked at how badly

1   he was hurt.

2           Now, my client is brought up along the railroad

3   tracks back to the base of the service road.  Juan Rivera

4   testified that he went down that service road, and he said

5   he stayed there until dawn, and he was looking.  He very

6   forthrightly said, I stayed there the whole time.  I

7   didn't wander around.  I was looking down the railroad

8   tracks.  I was looking for the suspects.  I didn't see

9   anyone bring him back up or take him up to the car.  He

10   didn't see Hamel bring Mr. Gonzalez up; he didn't see

11   Jackson; he didn't see Shea.

12           So what is that telling you?  What does that

13   mean?  He certainly is not a fool.  Highly respected, 28

14   years on the force, well trained.  What it means is he

15   wasn't going to be part of the coverup.  He wasn't going

16   to testify as to anything to the case.  He said, I didn't

17   see anything.  I was there all night till dawn.  I didn't

18   see Shea come up with him; I didn't see Jackson come up

19   with him; I didn't see Hamel come up with him; nothing,

20   which means he didn't -- he wanted to thread the needle

21   between being honest and not necessarily going against his

22   fellow officers.  It's convoluted to be sure, but what

23   would be the explanation of him to be standing there all

24   that time till dawn and then to come tell us now that he

25   didn't see him?

 1           Another, Sergeant Angon, again, another highly

 2  respected member of the force.  He's at the department.

 3  The cruiser pulls up.  He goes out, and the testimony was

 4  he opened the door and even looked in, he looked in at

 5  Mr. Gonzalez, and when he opened the door, he was pretty

 6  close to Mr. Gonzalez.  Oh, I didn't see any injury.  I

 7  didn't see an injury.  And I think -- I can't see your

 8  TVs, is there a picture up on your TV -- yes, that's the

 9  injuries my client is reflecting.  His face was deformed,

10  according to Dr. Dessieux.  And even after the emergency

11  room when they wiped him up and cleaned him up, he still

12  had dried blood on his face.  His eye was swollen shut.

13  He had to pry it open.  The kid was badly injured.

14           Sergeant Angon says, Oh, you better take him to

15  the hospital right away; but, again, like Rivera, he's in

16  this box.  These guys put those two officers in a bad

17  situation.  Were they going to go against their brother

18  officers or were they going to tell the truth?  Well, they

19  couldn't bring themselves to go against their brother

20  officers except they weren't going to lie either to the

21  extent they took the easy way out and said, Oh, we didn't

22  see nothing.

23           It's not possible for Sergeant Angon not to have

24  seen the injuries when he's a matter of a foot or two away

25  from the face.  My client, as Dr. Dessieux testified to,

1    as a medical expert, suffered brutal and horrific

2    injuries, brutal and horrific injuries that required

3    extensive surgery and weeks and months of repair, facial

4    reconstructive surgery.

5           Now, the judge gave you instructions a few

6    moments ago about evaluating the credibility of witnesses.

7    I want you to remember --again, you guys paid close

8    attention -- when the gentlemen took the stand, when the

9    officers took the stand -- well, when those men took the

10   stand and I impeached them on their prior, former

11   testimony, how they acted.  When they came up, I'll never

12   forget the look on Hamel's face after they came and they

13   did that demonstration of how he hit, and then I came up

14   and I said, Well, Officer Hamel, if you hit the way you

15   were just telling us, then how come there's no injuries to

16   the right side of his face, they're all to the left side

17   of his face, and they're crushing injuries?  Well, then,

18   whoa, whoa, I think he looked at the judge for relief, and

19   then he looked at his attorney for relief.  I told him,

20   No, no, no; you look at us; look at here; answer the

21   question.  And then it's all, Oh, oh, well, I hit him, and

22   then I came back, and I hit him.

23          Well, then if you hit him again, if you hit him

24   now the way he described again, it still didn't satisfy

25   the question.  That was so problematic that two days later

1   they had to try it again to correct mistakes they made the

2   first time, but they only made it worse because then he

3   testifies, Oh, I hit him like this, and then I came back

4   like that.

5          Well, if you hit him like this, then how come

6   there's nothing on this side of the face?

7          Then he takes a fallback, Oh, I must have missed

8   the first time.

9          That's crazy.  And the blow that was the cause

10  of the injuries, if you remember from Dr. Dessieux, was

11  downward.  It came down like that.  It wasn't side to

12  side.  If it was side to side, his nose would have been

13  broken or other injuries would have taken place, and there

14  never was any injury to the right side of his face.

15         And I always thought it was odd that you had

16  experienced police officers get out of their cruiser

17  without a flashlight to look for a suspect.  What is that

18  all about?  And then it was too dark to see, but then

19  Jackson was walking down the railroad tracks looking for

20  footprints, wet footprints across the stones.  Well, if it

21  was too dark to see, how come he could see those without a

22  flashlight?  Then he tried to say, Oh, I was near Hamel.

23  But, no, he wasn't.  He was further away.  In fact, when

24  Hamel called out, then he had to run back.

25         And then think of this; they come up with this

1    story that he got attacked, Hamel got attacked.  You see

2    where you are there, that's where the berm was, we all

3    agreed on that.  So Hamel is here.  He puts his flashlight

4    out.  Now, you had conflicting testimony because two of

5    the officers had previously testified that they heard him

6    say, Stop, show me your hands; I got him; I got him; show

7    me your hands; show me your hands.  Of course, I had to

8    impeach him with that prior testimony because they said

9    something differently out here; and then after I impeached

10   him with that prior testimony, Oh yeah, yeah, he said

11   that.

12           So if he sees him, I got him, I got him, show me

13   your hands, show me your hands, it's not like he's walking

14   in there, somebody reaches out and grabs him.  That's

15   crazy.

16           And, again, they like to make this story that

17   there was this huge area and that they searched for him

18   for 20, 30 minutes.  That's not true either because Torres

19   said -- he bragged about he went over the fence, it was

20   bad, muddy, terrible conditions, he knew he couldn't go

21   that fast or go that far, so the guy had to be nearby.  Oh

22   yeah, I could hear him; we knew where he was.

23           So then they came up, we're talking about from

24   there to here, and they're all agreeing that this is the

25   distance involved, Lanoie and -- they all verified it,

```
 1    albeit with a little impeachment, but they all verified
 2    it.  So you have three, four grown men, trained police
 3    officers -- one, two, three, four -- surrounding a kid
 4    here in the middle, right here in the middle, with
 5    flashlights.  They could see him.  They could see him.
 6    And after they apprehend him, he has a traumatic brain
 7    injury, his face is crushed in, he's blind in his left eye
 8    for the rest of his life?  Yes, they did it.  Don't make
 9    any mistake about it; they did it.
10           And the story is disjointed because as it
11    evolved, they didn't realize the enormity of what had
12    happened, and then when it dawned on them, then they go,
13    Well, we better change the story.  Okay, yeah -- no, Shea
14    took him.  Jackson and Hamel, we just passed him off.  We
15    didn't take him.  We didn't lead him out.
16           Again, if what they did to him in the drainage
17    ditch was legitimate, why have to change the story?  Just
18    go with it.  Yeah, we took him out.  He followed us.  You
19    know, we had to subdue him.  But in their own minds they
20    know they did a bad thing.
21           Again, this isn't an indictment of all police
22    officers in this country.  In fact, we're going to ask you
23    to render a verdict in support of all the good officers
24    who do great work every night and don't torture or beat up
25    brutally, horrifically their suspects.
```

1            I think Torres at one point said unregistered

2    motor vehicle.  So you make a mistake driving an

3    unregistered motor vehicle, and this is what happens to

4    you?  We can't allow that to happen in America today.  We

5    can't allow the government to do that to our people.

6            Now, I'm going to talk to you briefly about

7    damages.  You've heard the judge's instruction on damages.

8    What would be the appropriate damages in this case?  I

9    don't think any of us in this room would want to go

10   through what he has gone through and to live the rest of

11   your life blind in your left eye, always battling the

12   effects of a traumatic brain injury and 99 percent of the

13   people in your age group are better than you, have higher

14   functionality than you.  So I'm going to ask you to

15   consider $150 a day for him being blind in the left eye

16   and $150 a day for the traumatic brain injury.  Now, we

17   previously stipulated, it's an exhibit, that he has a life

18   expectancy of 51 years.  So $300 a day, what some people

19   spend on a dinner out at night, for 51 years comes out to

20   $5,584,500.

21           Then you get to the issue of punitive damages.

22   We cannot allow this to happen again to other people.

23   Punitive damages are warranted in this case, and I'm going

24   to ask you to award $4 million in punitive damages

25   because, don't forget, there were four officers there.  We

1    don't have to prove which officer specifically did the

2    injuries, just that amongst the four of them the injuries

3    were inflicted upon him.  And however the makeup turned

4    out, the other one, two or three officers had a duty to

5    intervene and to stop that from happening.  If you were on

6    the street and you saw somebody kicking, punching, whether

7    it was a rock or a blunt object, and you remember

8    Dr. Dessieux said this was a blunt object, like a baseball

9    bat or a baseball or something that crushed that face, you

10   would stop it.  You would call the police to come stop it,

11   except in this case the perpetrators of this crime were

12   the police.  We have got to have limits on what we allow

13   the government to do, and that's what punitive damages are

14   for.

15           Now, relative to infliction of emotional

16   distress, they had reckless disregard for their conduct,

17   for what they did.  They intended the conduct.  As a

18   consequence of their conduct, the injuries ensued.  So

19   remember they had a duty to intervene, and then all of

20   them were involved with the infliction of emotional

21   distress.  We met the elements of all those claims.

22           You know, my dog just had surgery.  I have a

23   German Shepherd, and he always has something with him.

24   He's a great guy, though, great dog.  So last night I got

25   home late, and I took him out for his walk with his

1   bandage and his cone of shame.  I took him out for his
2   walk, and it really was cold, but it was beautiful last
3   night, crystal-clear night.  I looked up and Orion was
4   high in the sky.  The moon was three-quarters.  If the
5   moon wasn't there, I'm sure you could have seen the
6   Horsehead Nebula in the Belt of Orion.  It was absolutely
7   beautiful.  I'm an astronomy buff, not that I get a chance
8   to use my scope very much, but I love astronomy.  We sat
9   there, and I looked up, and the dog was looking up too.
10  And I'm not boring with this, what I'm trying to get to is
11  that it struck me, why are we placed here on this earth?
12  Why is this universe given to us to enjoy, to create,
13  develop and move forward?  It's to nurture and help each
14  other, even those maybe less fortunate than us, not to
15  take an opportunity to horrifically and horribly and
16  brutally beat someone.  There is no, there is no
17  justification for horribly and brutally beating someone
18  you have in custody, who's helpless.  We cannot allow the
19  government to have that leeway.  We've got to hold the
20  government to a strict standard, an objective standard.
21  It's not whether they were afraid.  It's not whether they
22  had anxiety.  That's not the standard.  They violated the
23  standard.  They beat this kid horribly.
24          I know you will remember the testimony.  I know
25  you will remember the times they were impeached.  I know

1    you will remember the demonstration that went south, and

2    then when they tried to do it again, it went south again.

3    And I want you to remember, why did they change their

4    story?  Why did they purposely come in here and lie that

5    they're the ones who didn't take him out, Hamel and

6    Jackson, didn't transport him out, when on numerous

7    occasions under oath, not only by me but by others, under

8    oath they testified that they had.  It's because they

9    wanted to distance themselves from that because they knew

10   what they did was wrong.

11           I want to thank you very much for your

12   attention, time, and I'll get a chance to talk to you

13   again in a few minutes, but thank you.

14           THE COURT:  All right, thank you.  Mr. Mengacci?

15           MR. MENGACCI:  May it please the Court, good

16   afternoon -- good morning, ladies and gentlemen.  First of

17   all, I want to also thank you for your service and your

18   attention here today.  As Judge Underhill has indicated to

19   you, we're in a courtroom where a plaintiff brings a

20   lawsuit, any plaintiff against any defendant or

21   defendants, and the law is clear, the burden of proof is

22   on the plaintiff to prove each and every claim that he is

23   making by a fair preponderance of the evidence and to

24   prove that each and every claim that he's making resulted

25   in some sort of injury or damage as a result of that

1    particular action.

2           Now, His Honor has instructed you in two areas

3    of the law, the 1983 action or the civil rights action

4    that's brought where the claim is that these officers

5    engaged in excessive force and failed to intervene when

6    they were aware of a situation where someone's rights were

7    being violated.  They were in a position to act and they

8    failed to act.  That's the first part of the plaintiff's

9    claim.

10          The second part of his claim is that he has been

11   subjected to intentional infliction of emotional distress.

12   This case, like every other case, is about the evidence as

13   you folks will find it to be and the law as Judge

14   Underhill has instructed you.  And I often look at the

15   trial of a case like a jigsaw puzzle.  As pieces of

16   evidence come in, you're getting more and more pieces of

17   the puzzle, and at the end it's your job to put that

18   puzzle together and figure out what really happened on

19   August 7, 2010, what happened that evening.

20          Now, you're going to find that some of the

21   pieces of that puzzle fit very nicely, one follows from

22   the other.  Some of that is going to be because there's

23   facts here that we'll talk about in a minute that really

24   aren't in dispute.  When it comes to disputed facts, then

25   those pieces aren't going to fit so nicely, and that's

1   where credibility of the witnesses and how that particular

2   piece of that puzzle fits or doesn't fit with the rest of

3   the puzzle.  That's what your job is going to be, and that

4   is based not only on the evidence that you heard, but

5   sorting through that, and as I told you in my opening

6   statement, this is a clear case of credibility.

7           We have two versions of what happened on

8   August 7, 2010 that are diametrically opposed.

9   Mr. Gonzalez says he was hit with rocks and that he was

10  beaten while he lay on the ground, unhandcuffed, in an

11  unconscious state.  The officers have testified that

12  that's not what happened here at all.  So in terms of that

13  issue, credibility is very important.

14          So let's talk about the facts.  August 7, 2010

15  Mr. Gonzalez decides, for whatever reason, that rather

16  than responding to the lawful order of a police officer,

17  he's going to take him on a chase.  So he jumps onto

18  Interstate 84 in an easterly direction, and shortly after

19  he's on the highway and being chased by a police cruiser,

20  he gets involved in a collision with that police cruiser.

21  By his own admission, that cruiser hit him at least two

22  times, all on the driver's side of the car, and caused his

23  car and the cruiser to lose control.

24          There's the photograph, Exhibit A-2, of the

25  damage to Mr. Gonzalez's car on the driver's side, which

1  would mean -- this is very important -- that the left side

2  of his body was on the inside of that door.  So despite

3  the fact that he's now collided with a Crown Victoria

4  police car and caused that car to become disabled, he

5  decides that, Well, maybe I can get away from this

6  completely, so let me keep running, and now two police

7  cars are chasing him all the way to Newington,

8  Connecticut, a distance of approximately 30 miles.

9      According to Mr. Gonzalez, his vehicle is hit

10  again as he's exiting Exit 31 of Route 9, gets off the

11  exit ramp, his car is hit again on the driver's side.  Now

12  he decides to take a right-hand turn into an industrial

13  area and a large parking lot, goes through one locked

14  gate, goes through a second locked gate, drives to the end

15  where he can go no more.  He's now cornered, and he gets

16  out of his car.

17      Here's the photograph, A-6, of the front of his

18  car, and you can see the vegetation in the right front

19  part of it, and one of the officers testified that he

20  believed that the car was up against or through the fence.

21  So there's yet another collision.

22      Mr. Gonzalez claims that the second gate, which

23  has been shown in the photographs and testified to by the

24  officers as being a gate that slid across from left to

25  right or right to left as opposed to the first gate that

1   had a chain on it, Mr. Gonzalez said that gate just

2   opened.  But here's his car, and look at the roof.  The

3   police officers said the gate that goes back and forth

4   came up, landed on top of the car and flew back.  Here's

5   evidence again that the accident occurred as the officers

6   are saying.

7            So now we get to the ditch.  Not disputed by

8   anyone that Mr. Gonzalez and his cousin, Mr. Perez, jump

9   over the fence.  Mr. Perez, for some reason, was able to

10  elude the police.  He was never found that evening.

11           Now, Mr. Gonzalez testified that when he jumped

12  over the fence, within a matter of seconds he saw two

13  other officers jump over the fence.  He said when he

14  landed on the fence, the opposite side of the fence, the

15  ground was hard initially, and then it went down and it

16  was muddy, vegetation, overgrowth, trees.  You have the

17  photographs; you've seen it.  There's no dispute as to

18  what the condition was that evening in August.

19           So now Mr. Gonzalez says, Well, then two

20  officers that jumped over the fence -- which I think from

21  the evidence is pretty clear were Officers Lanoie and

22  Torres, that's what they testified to, and I don't know of

23  any other testimony that would suggest anyone other than

24  them were on the fence side of the ditch -- they were

25  within four to five feet of Mr. Gonzalez.  You may recall

1    that when I was questioning him, I stood in front of the

2    jury box, and he approximated where it was.  We used the

3    squares on the floor here.  So now Lanoie and Torres are

4    within four to five feet of this guy.

5           Then he says the guys on the other side, on the

6    ditch side, they're five to seven feet away from him.  But

7    Mr. Gonzalez never explained what happened for the next 30

8    to 45 minutes.  This didn't happen instantly.  They didn't

9    come over the fence, come within four to five feet of him,

10   as Mr. Gonzalez suggests, and just stood there and did

11   nothing.  Mr. Gonzalez says, Well, one of them pointed a

12   taser at me because I could see the dots on my body.  I

13   was getting ready to be tased, from four to five feet

14   away.

15          Now Mr. Gonzalez says, My attention is now

16   directed toward the railroad tracks because I hear an

17   officer say, Turn off the flashlights.  So at that moment

18   now Mr. Gonzalez turns around, and Officer Torres and

19   Officer Lanoie are to his back.  The rocks that he claims

20   are being thrown are now coming exclusively from the

21   railroad side, not from Mr. Lanoie, not from Mr. Torres.

22          So now he says, I get hit with a rock on my

23   right side, right side, just above my waist, and I'm in

24   excruciating pain.  My rib killing me, my rib.

25          Well, I suggest to you, ladies and gentlemen of

1     the jury, the reason he said that is because he knows that

2     later on he was diagnosed with a slight fracture of a rib,

3     but what I want to show you, and this is in the Saint

4     Mary's Hospital record, this is the radiologist's report

5     of the x-ray that was taken, and if you look here, it says

6     Exam Date:  8/7/2010; Time:  05:31.  That's 5:31 in the

7     morning.  And here's what the radiologist says.  He says,

8     Impression:  As above.  What does it say above?  The tiny

9     pneumothorax seen on CT, the chest is not definitely

10    identified on the radiograph.  Well, that doesn't mean

11    anything as far as what I'm talking about, but this does:

12    The known left, left T6 rib fracture is hardly

13    perceptible.

14            Mr. Gonzalez said he got hit on the right side.

15    This hardly perceptible rib fracture is on the left side.

16    So Mr. Gonzalez says, I'm hit with rock number one.

17    Remember I asked him to identify the rocks one, two and

18    three so we're all talking about the same thing.  Rock

19    number one hits him on the right side about the waist, and

20    now he's in excruciating pain, doubling over because he

21    thinks he has to reference this somehow to the rib

22    fracture that he finds out about later on.

23            And now comes rock number two.  And there were

24    about six or so rocks thrown in total, three of which hit

25    him.  Rock number two hits him in the left side of the

1   face.  Rock number three hits him in the left side of the

2   face and renders him unconscious.  He said that.  I was

3   unconscious.  I fell into the mud, face down into the mud.

4           So now let's remember this.  He falls -- he's

5   been -- he admits he's been in there up to his knees, he

6   can't move, and now he gets knocked out by this rock and

7   falls forward so that his whole body is covered with mud,

8   including his face.  So he says, I don't know anything

9   else until I'm lying on the ground, unconscious, not

10  handcuffed, not resisting arrest, and there's two guys

11  standing over me, kicking and punching the living

12  daylights out of me.  Twenty to 30 punches to the head, he

13  says, that's what happened, 20 to 30 punches to his head,

14  while he lays helplessly on the ground, and that's his

15  testimony.

16          Now, here's the picture of Mr. Gonzalez taken at

17  6:00 p.m., over 12 hours, 14 hours after the incident.

18  This is a guy who's been punched in the face 20 to 30

19  times.  Dr. Dessieux testified that this was a picture of

20  the right side of Mr. Gonzalez's face where he was punched

21  20 to 30 times, and Dr. Dessieux specifically said he had

22  no injury to the right side of his face.  So this is the

23  horrific and brutal beating that Mr. Gonzalez supposedly

24  took.  This is what he looked like 14 hours later, after

25  swelling sets in.  That's what he looks like on his left

1   side, and this is what he looks like on his right side.

2   So now Mr. Gonzalez says he's lying there and being

3   beaten.  What do the police officers say?

4          Well, the police officers say that at some point

5   Officer Hamel indicates that he's going to be moving in.

6   He sees or hears something, hears some rustling in there,

7   and he's going in.  He goes in, and Officer Hamel is

8   immediately attacked by Mr. Gonzalez.

9          So now what does Officer Hamel do?  Well, what

10  does Officer Hamel know at that point in terms of what's

11  in his mind for his conduct as to whether it's objectively

12  reasonable or not?  So Officer Hamel knows that he's just

13  gone through a 30-mile chase with this guy, has no idea

14  whether he has a weapon, has no idea where Mr. Perez is,

15  none of this, and he's in an area of swamp, water where

16  you can't move around freely, and now someone is swinging

17  at him and then eventually grabs him by his vest and

18  starts to pull him down as if to pull him into the water

19  or muddy area.

20         So Officer Hamel responds accordingly.  He

21  testified -- and I know Mr. Creed thinks that he testified

22  the first time, but of course it's your memory.  I

23  remember it very vividly that he talked about the fact

24  that his revolver was on his right side, so he would have

25  had his right hand free because if he needed to get his

1    revolver, he could access it with his right hand.  He had

2    the flashlight in his left hand, and he indicated that he

3    was punching with his right hand, and that he was swinging

4    with the flashlight from left to right, and as he's

5    trained, from right to left.  That's what he said he was

6    doing.  And he said that he landed some of those strikes,

7    either with the flashlight or with his fist, to parts of

8    Mr. Gonzalez's body, that he couldn't tell you what parts

9    they were because it was too dark to see.

10          What's interesting about that is Mr. Gonzalez

11   testified unequivocally that no police officer, including

12   Officer Hamel, struck him in any way while he was in the

13   ditch.  Mr. Gonzalez's sole claim is that he was struck by

14   rocks and only rocks, three rocks.

15          Now, after he's taken out of the ditch, he says

16   he's unconscious.  The officers say that they help him off

17   to the dry area here and hand him off to Lieutenant Shea.

18   Now, Mr. Creed has made a lot of this issue.

19          Officer Hamel did testify at a previous occasion

20   in connection with matters involving this case that he and

21   Officer Jackson took Mr. Gonzalez from the area of the

22   ditch, down along the railroad tracks, into the police

23   vehicle and on to the police department.  Officer Hamel

24   said, I was mistaken; that's not what happened.  We passed

25   him off to Lieutenant Shea.  So Officer Lanoie says, We

1    passed him off to Shea.  Officer Torres says, We passed

2    him off to Shea.  Officer Jackson says, We passed him off

3    to Shea.  Officer Hamel says, We passed him off to Shea.

4    And Detective Shea said, They passed him off to me, and

5    then I, and I alone, walked him down the tracks to a

6    cruiser where my partner, Detective Liquindoli, was

7    waiting, and we put him in the car and drove him to the

8    police department.

9           From the police department -- at the police

10   department you heard from Sergeant Angon.  He said,

11   Liquindoli is driving, Shea is in the passenger seat, and

12   Mr. Gonzalez is in the back.  He tries to talk to

13   Mr. Gonzalez, but he doesn't respond, probably because he

14   knows he's in big trouble.  And he doesn't notice any

15   visible injuries but says it's policy, if someone

16   complains of injury or they've been involved in a motor

17   vehicle accident, that they go to the hospital.  So he

18   said, Take him to the hospital.

19          So now we arrive at Saint Mary's Hospital.

20   These are all part of the exhibits that you will have.

21   And I asked Dr. Dessieux about this as well.  You'll see

22   up here this is the registration form.  Let me just bring

23   it in a little bit.  Patient Registration Form, Emergency

24   Department, Gabriel Gonzalez, 8/7/10 at 4:57 a.m.  So

25   that's the first time he's at the hospital, 4:57 a.m., and

1    this is the first registration form that just has some

2    demographic and background information.

3            The next document chronologically is the triage

4    assessment, and that's at 4:39 a.m., two minutes later.

5    So now they check him in within two minutes, give him to a

6    triage nurse, and now according to Mr. Gonzalez he tells

7    this triage nurse exactly what happened to him.  As a

8    matter of fact, he said that the officers told this nurse

9    that he had hit the steering wheel, and he immediately

10   said, No, no, no, they threw rocks at me; they punched me;

11   they kicked me.

12           What did the nurse record?  Patient was running

13   through the swamp for 45 minutes and was tackled and hit

14   in the face, complained of left rib pain, bleeding from

15   the nose and left eye swollen.  Not a single thing about

16   being hit with a rock.  As a matter of fact, he said he

17   was tackled.  Well, that's exactly what Officer Hamel

18   said, he had to fight with him and bring him down.  He

19   tackled him.  So when Mr. Gonzalez was asked the very

20   first time by a healthcare provider, What happened to you,

21   Mr. Gonzalez, this is what he told her, not that he was

22   hit with rocks.

23           Now, here's a diagram, also in the hospital

24   record, called Trauma Tertiary Survey, and over here is an

25   anatomical drawing of a body.  And you will see there that

1    there's certain letters that correspond to this particular

2    injury code.  Let me clear this.  The injury code is here.

3    The position on the body is here.  So what does it say

4    here?  It says, well, on the left eye area there's an "E,"

5    which stands for ecchymosis, which is black and blue.  The

6    rest of his body is simply abrasions:  "A," "A," "A," "A,"

7    "A."  Now, there's a category over here for contusion --

8    I'm sorry.  Right over here there's a "C" for contusion

9    and an "L" for laceration, and over here is the "A" for

10   abrasion.  Now, if this guy was hit 20 to 30 times in the

11   face and kicked all over his body, wouldn't you think that

12   he would have contusions on his face at least?  No

13   contusions.  Abrasions -- scrapes, scrapes, something you

14   can get from falling down, running into bushes, being in

15   an automobile accident, any number of things can cause

16   abrasions -- but no contusions, no contusions.

17          Now, let's move along in the medical record from

18   4:39 a.m. when he's seen by the triage nurse, and here's

19   another entry.  This is at 6:15 a.m.  He has now another

20   opportunity to tell a different healthcare provider what

21   happened to him.  What's it say?  "SP" -- we know that

22   means status post -- assault, was hit in the left face,

23   left eye swollen, laceration to left face.  Then it says

24   patient returned from CAT scan.  Nothing about a rock.

25   Another opportunity to say, I was hit with a rock, I was

1    hit with rocks and I was punched and kicked.  He doesn't

2    say that.

3                9:30 a.m., 9:30, surgery, 22-year-old male

4    involved in an MVC, motor vehicle crash, car -- car chase

5    and resisting arrest -- something that I can't read

6    here -- with complaints of left-sided face pain, left

7    chest pain.  Nothing about rocks.

8                Now we're up to 9:30 in the morning, and here

9    comes Dr. Dessieux's dental resident.  Now, this

10   individual, this female individual, who's a dental

11   resident, working directly under Dr. Dessieux, is now

12   coming in for the purpose of a maxillofacial consultation

13   under his auspices.  And so now Mr. Gonzalez is with the

14   dental resident and has all the opportunity again to tell

15   about being hit with rocks.  10:30 a.m:  22-year-old male,

16   seen in the emergency room, caught in an assault.  Nothing

17   about rocks.  11:30 a.m., ophthalmology consult, yet

18   another person seeing Mr. Gonzalez, and what does he say,

19   or she, I can't tell:  Blunt trauma to OS this past early

20   a.m.  Nothing about rocks.

21               Now, so we leave off at 11:30 a.m., and now we

22   fast forward to 6:00 p.m., and here comes Dr. Dessieux,

23   right?  He's going to see this patient for the very first

24   time.  Dr. Dessieux never testified that Mr. Gonzalez told

25   him he was hit with rocks, never did.  And, as a matter of

1  fact, if you look at Dr. Dessieux's consult at 6:00 p.m.,

2  it says:  22-year-old male, status post assault.  Nothing

3  about being hit with rocks.  And this is the photograph,

4  again, that he took that shows Mr. Gonzalez's condition at

5  6:00 p.m. that evening.  You have some sutures here.  I

6  think these are sutures here and here.  You have an

7  abrasion over here.  And, I mean, I know I'm certainly not

8  a maxillofacial, but I know -- I mean, I know he had the

9  fracture here, and I'm not disputing that he had a

10 fracture here, but this doesn't look all that terribly bad

11 to me, especially if you've been pummeled 20 or 30 times

12 with fists and kicked and beaten beyond belief.

13         So now what does Mr. Gonzalez do after he gets

14 out of the hospital for a couple days?  There's no records

15 that we have of anything happening until he goes back on

16 August 13 when Dr. Dessieux does the surgery, and then

17 following that Dr. Dessieux says he came to see me for

18 half a dozen visits, but we don't have those records

19 either.  And then there is no treatment whatsoever by Mr.

20 Gonzalez from anybody, for any reason, until he goes to

21 StayWell Health.  And when does he go to StayWell Health?

22 August 25, 2011, a year after the accident.  So for one

23 year we have no record of Mr. Gonzalez having any

24 treatment for his eye other than the six or so visits,

25 certainly no treatment for this concussion which Mr. Creed

1    likes to call a traumatic brain injury to make it sound

2    worse, but it's a concussion, no treatment for that

3    whatsoever, and he goes to StayWell on August 25, 2011,

4    and it says here that Reason for Visit:  Review of test

5    results, has copy with him.  His active problems are eye

6    symptoms, hyperlipidemia -- which is high cholesterol --

7    and prehypertension.  He's got some problem with his blood

8    pressure potentially.  Nothing about his eye bothering

9    him, nothing about headaches, dizziness, nightmares,

10   anything like that.

11         Let's go further.  Medication listed, reviewed,

12   none.  So he's taking no medication at this point for any

13   reason.  No headache.  No muscle ache.  No dizziness.

14   Current medications, none.  This is a guy who's testified

15   that since the cops beat him beyond belief, he had

16   dizziness, headaches, nightmares, sleep disturbances, all

17   those things from the very beginning of this situation.

18   Not a thing in here about that.  Again, Review of Systems.

19   Head:  No headache.  Neurological:  No dizziness.  No

20   nausea.  No vomiting.  No muscle aches.  None of that.

21         So this is the first record we have of any

22   treatment beyond Saint Mary's Hospital or Dr. Dessieux for

23   Mr. Gonzalez following this incident; and oh, by the way,

24   let's not forget that when he goes to StayWell, there's

25   nothing in here about having been the subject of being hit

1   by rocks or beaten by police officers, not here.

2          Now, interestingly, he goes to see next, this is

3   now -- we're in August of 2012, so this is yet another

4   year later, right, document date, he goes to see a

5   counselor, Judith Gorra, and she writes under Presenting

6   Problem:  Description of Chief Complaint, Symptoms, How is

7   the problem affecting daily functioning, she says:  Client

8   experiencing symptoms of PTSD, anxiety attacks, depression

9   and nightmares, August 27, 2012.  This lawsuit was brought

10  in March of 2012.  This is the first record that we have

11  of any complaints by Mr. Gonzalez following this incident

12  for anxiety attacks, depression and nightmares.  Is it

13  simply a coincidence that all of a sudden this shows up in

14  a record five months after his lawsuit is brought?  I

15  don't think so.

16          Then he goes to First Step Counseling Center,

17  and now this time he's there -- now we jump to 2014, so he

18  sees Judy Gorra for some visits, and you'll have these

19  records.  He sees her for a certain period of time, and

20  then he doesn't see anybody for a while, and then in --

21  this is actually the discharge date.  The records will

22  show you that he saw her on two occasions.  I believe it

23  was April and May of 2014.  This document, which is part

24  of those records, shows that he was supposed to be in

25  individual therapy, that he had certain goals that he

1    didn't meet, and the reason he discontinued, according to

2    what's here, it says:  No response to "I have not heard

3    from you in some time letter" offering patient scheduling.

4           So here he's being offered assistance for the

5    problems he says he's having and doesn't show up.  He goes

6    for two or three times.  Why?  Well, I would submit to you

7    that all of these visits that he's doing now are related

8    to the litigation.  He's got to build up a file here so he

9    can come before you and say, I have all these injuries.

10   This is why that's happening.

11          Now, he eventually winds up with Dr. Collins,

12   and Dr. Collins indicated that he wrote this report on

13   July 23, 2015.  And he indicates in the first paragraph

14   that he saw him -- I believe he indicates the dates.  Yes,

15   in the second paragraph there it says:  Mr. Gonzalez was

16   initially evaluated at UPMC Sports Medicine Concussion

17   Program on 8/5/14, approximately four years after he was

18   injured.  At the initial appointment there were several

19   deficits, etc., etc., and what I want to point out to you,

20   which is back up in the first paragraph, is where it

21   begins "although."  "Although not formally evaluated for a

22   concussion, he recalls experiencing headaches, dizziness,

23   vision change, fatigue and cognitive difficulties."

24          Dr. Collins testified that a concussion occurs

25   when the inside soft matter brain comes in contact through

1    some rotational or lateral forces, and one receives a

2    concussion, and that a TBI is a form of concussion.  And I

3    asked him this question for a reason, very specifically:

4    Dr. Collins, those symptoms -- that I just read to you --

5    those symptoms are consistent with a concussion?

6              Yes.

7              When would you have expected the onset of those

8    symptoms?  And I said to him, in a short time?

9              And he asked me, Well, what do you mean by a

10   short time?

11             And I said, Well, Doctor, within days or weeks?

12             His answer was, I agree with that.

13             You will see nothing in any record whatsoever

14   that these symptoms were displayed and manifested within

15   weeks of this incident.  This is all made up after the

16   fact to bolster the litigation.

17             What else does he say?  He indicates that there

18   was improvement -- I'm going to kind of summarize this

19   because I'm running short on time, but let's just go to

20   his summary here at the end.  He says that he had a mild

21   traumatic brain injury as a result of the assault,

22   presented with persistent post-concussion symptoms when he

23   was evaluated four years later.  He was treated for nine

24   months and improved dramatically, reaching an estimated

25   85 percent of pre-injury functioning.  He was having

1    minimal post-concussion symptoms and evidenced significant

2    improvement on neurocognitive testing.  However,

3    persistent noncognitive deficits were likely medicated --

4    mediated by the impairment, excuse me.  Functionally, he

5    had returned to the daily -- usual daily activities

6    without limitations, including working part time.  And he

7    was also getting amitriptyline for his migraine headaches,

8    which you remember Dr. Collins said, when he asked him

9    initially did he have migraine headaches, he said no.  And

10   then Dr. Collins read Dr. Zito's records and he saw from

11   Dr. Zito's records that Mr. Gonzalez didn't tell him the

12   truth.

13          But here's something that's very interesting, I

14   think.  Let's look at the first page here, first

15   paragraph.  Let's start here with this sentence, "he."  He

16   was reportedly assaulted by officers, struck in the head

17   by fists and equipment -- and equipment -- as well as

18   stones.

19          What equipment?  Flashlight?  So now is he

20   telling Dr. Collins, No, I was hit with a flashlight, and

21   I was hit with stones?  See, the story keeps changing for

22   Mr. Gonzalez every time he takes another turn.

23          Then he doesn't see Dr. Collins from May of 2015

24   until October of this year, at which time he's seen by two

25   individuals in the program that Dr. Collins oversees, and

1   one of them is a medical doctor, and her impression is

2   right here, which when I asked Dr. Collins did he agree

3   with that, his answer was entirely.  Entirely.

4   Twenty-eight-year-old male, status post reported assault.

5           Now, Mr. Gonzalez testified that this was the

6   first time he saw this person, so he didn't tell her about

7   the rocks either.  It's still about an assault.  "At this

8   time it is difficult to determine which symptoms are as a

9   result of the incident in question.  His case is

10  multifactorial, complicated by mood disorder, stressful

11  social circumstances and litigation.  He has had

12  significant improvement such that he is able to engage in

13  physical activity as well as work."

14          Mr. Gonzalez says he can't play sports anymore.

15  Right here she says no problem with that.  And she also

16  indicates that his situation is multifaceted.  And also

17  this is where it's reported on page 1 somewhere on this

18  document where his significant other has left and he's not

19  seeing his children, contrary to the testimony of

20  Ms. Maldonado who told you how all this has changed

21  Gabriel.

22          So, Your Honor, how much time do I have?

23          THE COURT:  Three minutes.

24          MR. MENGACCI:  Thank you very much, Your Honor.

25          So, in conclusion, ladies and gentlemen, as I

1    said in the beginning, this case is about credibility, and

2    I would submit to you that there are so many

3    inconsistencies, I've counted at least 12 or 13 that I

4    don't have the time to go through right now, but you'll

5    remember from the evidence.  For example, Mr. Gonzalez

6    said he lost consciousness, never told anybody he lost

7    consciousness.  Mr. Gonzalez saw Dr. Collins.  Dr. Collins

8    asked him, Did you lose consciousness? He said, No.  So

9    it's just one right after another, after another, after

10   another.  This is a made-up story, it's wholly made up, he

11   thought about it after the fact, and the rocks came out of

12   the fact that you'll remember that he was walked down a

13   railroad track bed filled with rocks.  That's how he came

14   up with the story.

15          And the reason he came up with the story is

16   this.  If you had just outrun the police, collided with a

17   police cruiser, collided with other cars, drove through

18   two fences on private property, fleed from the cops,

19   assaulted a police officer and resisted arrest, you would

20   come up with a story, too, because the best defense is an

21   offense, and that's what he did in this case, and it's

22   just not consistent with what the facts and the evidence

23   are.

24          So I would respectfully submit to you, ladies

25   and gentlemen, that a defendants' verdict, in favor of all

 1   four officers, is completely justified on the basis of the

 2   evidence and the law in this case.  Thank you very much.

 3            Thank you, Your Honor.

 4            THE COURT:  Thank you.  All right, Mr. Creed,

 5   you reserved 15 minutes?

 6            MR. CREED:  Thank you, Your Honor.  Thank you

 7   very much.

 8            Well, now we know the government's position on

 9   this matter.  The kid is in a drainage ditch -- first off,

10   I should thank them for putting up all those records that

11   say attacked, assaulted, attacked, assaulted by police.

12            There's a big mistake here, though, that's not

13   being brought to you.  The rocks.  It doesn't matter

14   whether he was hit with rocks or a flashlight or some

15   other device.  This case and your decision is not

16   predicated on whether or not you find he was hit by a rock

17   or not, because it's outrageous, it's offensive to all of

18   us to think that here, in this day and age, they stone

19   people in the Middle East, not here, at least that's what

20   we'd like to think.  So to create the illusion that you

21   must find that he was hit with a rock or we lose the case

22   is totally wrong, and listen to the judge's charge on

23   that.

24            Second, actually I feel good when I see that

25   we're talking now about the medical records because you've

 1   got a young man who suffered a brain injury.  Dr. Collins

 2   told you, We hope he can get better in some areas.

 3   Dr. Collins told you in two of the areas he's going to

 4   get -- we hope, if he continues in treatment and therapy,

 5   he will get better, but in two of the other areas he's

 6   never going to get better.  But we have a guy who gets a

 7   brain injury, and then in a matter of hours we're

 8   critiquing the way he's answering to a triage nurse.

 9            You've heard the testimony of Dr. Dessieux.

10   That's the testimony you can rely on.  And then to show

11   you this picture and to circle and say, See, it doesn't

12   look bad to me, Dr. Dessieux testified the whole thing was

13   crushed and it was facially deformed.  Ask yourself, have

14   they presented any evidence to contradict testimony of

15   Dr. Dessieux?  Have you heard any other expert testify in

16   this case?  With all the resources available to the

17   government, were they unable to get somebody who could

18   testify?

19            MR. MENGACCI:  Your Honor, I'm going to object

20   to that argument.  We have no obligation to produce

21   anyone.

22            THE COURT:  Yes, sustained.

23            MR. CREED:  Well, if you argue that there's no

24   damage to it and try to contradict Dr. Dessieux that, Oh,

25   look at the picture, when Dr. Dessieux told you how

1   horrific and brutal they were, crushed in, well, you

2   better come up, I think, you better come up with some

3   evidence to support that argument.

4          You remember Dr. Collins' testimony.  You can

5   have a traumatic brain injury without a concussion, he

6   said, although he did say he had a concussion, but he said

7   you can have a traumatic brain injury without it because

8   when the brain moves and shifts, the neurons are stretched

9   and leaches the chemicals.  It's beyond my capability to

10  understand all that so I rely on his testimony.  You heard

11  his testimony.  No matter how you may try to pack it, he

12  said the kid has a traumatic brain injury and that he's

13  going to have problems the rest of his life over it.

14         Now let's talk about that.  The community access

15  hospital, I'm going to address something personally that I

16  took offense to, this allegation that he only went for

17  treatment after he came to see me.  Well, what kind of

18  lawyers do you want in this country?  A family in crisis

19  comes to my door, I look at some of the records --

20         MR. MENGACCI:  Objection, Your Honor.

21         MR. CREED:  -- do you think I'm not going to

22  send him --

23         MR. MENGACCI:  Objection.

24         MR. CREED:  -- to the hospital --

25         THE COURT:  Just a minute, Mr. Creed.

1          MR. MENGACCI:  What Mr. Creed did in preparation

2    for this case is not evidence before the jury.

3          THE COURT:  All right, gentlemen, I'm going to

4    overrule that objection.  He's addressing an issue.  Go

5    ahead.

6          MR. CREED:  Do you think I'm just going to send

7    the kid home, sit in a dark room, in the corner in a dark

8    room?  Of course I'm going to send him to counseling.  Of

9    course I'm going to say, Go to your local community health

10   center, get a counselor; Veronica, get with him, get him

11   out of the house, don't let him sit in the house.

12         He did go to a counselor.  I think he testified

13   he did get a job.  He tried to get jobs in bakeries, part

14   time, menial labor jobs to give him some self-esteem to

15   get back on his feet.  That doesn't mean -- depression is

16   a horrible, horrible thing to live with.  Every morning

17   you get up and you have a dark cloud in your head

18   following you around.  It's a chemical imbalance in the

19   brain that affects you and affects every aspect of your

20   life dealing with your loved ones, dealing with your

21   children.  Now we're attacking a kid who had a traumatic

22   brain injury, his ability to communicate to a triage

23   nurse, as opposed to let's look at what the doctors say,

24   albeit he did say to the triage nurse he had been

25   assaulted by the police, and he offered -- when you look

1    at those medical records you see he's accompanied by a

2    police officer.  I think there was testimony that often

3    the police officer would attempt to answer.  Is that why

4    Dr. Dessieux asked the police officer to leave, so that he

5    could spend time alone with Gabriel?  Yeah.

6              My client suffered horrific injuries, for which

7    collectively we tried to get him treatment and tried to

8    get him care, not let him just sit alone in a dark room

9    and suffer and have his family suffer.  No one should have

10   to go through what he went through.

11             I'm going to ask you something, too.  I've got a

12   few minutes here.  Look at the inside of that car.  That's

13   the Neon.  There's no damage to the inside of that car.

14   There was no injuries inflicted on him anywhere in that

15   event.  His injuries were solely from the assault by the

16   police, which I'll point out to you begins on the highway.

17   Those are tires marks from the right front of the police

18   cruiser where they're banging him, trying to get him off

19   the road.  For an unregistered car they're trying to --

20   could have killed him.

21             And I'm going to show you this one here, very

22   important.  There's no, there's no damage to that car that

23   would cause any damage to him.

24             One more thing I want to talk to you about.  He

25   points out in the medical records about the injury to the

 1    left side, yet the rocks came to the right.  Well, don't

 2    you remember Hamel's testimony?  With his right hand, the

 3    gun hand, he wanted his gun hand free, he was pounding him

 4    into the torso, into this side.  That's where the rib

 5    broke.  He's punching him.

 6              Mr. Gonzalez was the victim of an assault.

 7    Sure, he shouldn't have run from the police.  He was

 8    driving an unregistered car, according to Torres.  He

 9    shouldn't have run from the police.  That doesn't mean he

10    gets a lifetime sentence to live with a traumatic brain

11    injury, a lifetime sentence to be blind in that eye, in

12    the left eye.  Two of those four categories that Collins

13    testified to he's never going to get better.  Ninety-nine

14    percent of people in his age in America are above his

15    ability.  That's not the country we live in.

16              These officers -- and I want to back up one

17    second.  I've got a few more minutes.  Torres is key to

18    this because when they hop over the fence, they could hear

19    him, they saw him.  He immediately put the flashlight over

20    to the other side, they knew where he was, and then they

21    moved in.  Torres said they knew where he was the minute

22    they hopped over the fence.  So what is this dysfunction

23    about how long it took, thirty minutes to find him and all

24    that.  That's crazy.

25              The second thing is they tried to make hay out

1    of the fact that, well, he said he wasn't unconscious.

2    You heard Collins' testimony.  It's a common fact people

3    who are knocked unconscious, you don't realize you're

4    unconscious.  You don't realize it because you're not

5    conscious.  Torres comes out and he says he was -- for the

6    most part he wasn't completely -- he wasn't completely

7    conscious, whatever, when he handed him off.  That

8    supports Gonzalez's testimony in the situation that we're

9    bringing you here today.

10          You've heard all the evidence, and as the judge

11   told you, argument is not evidence.  We're just trying to

12   point out what we think are important to the case.  We've

13   come here and told you the truth.  You look at all the

14   medical reports.  You look at the reports from Collins,

15   from Dessieux.  You heard their live testimony.  You

16   remember Dr. Sabherwal relative to the eye.

17          You look at the credibility of witnesses, how

18   many times did we impeach them on the witness stand,

19   impeach them with their demonstration?  As the enormity of

20   what they had done unfolded, they were trying to switch

21   the story to discredit him and to make it seem like they

22   were justified.  And again I'll point out to you -- and

23   this is what's so critical about this Shea thing -- if

24   they felt they were justified in the way they treated him

25   in the drainage ditch, then why did they have to change

 1   the story and have Shea walk him out?  Because they wanted

 2   to try and discredit it and distance themselves from that

 3   because Gonzalez had testified, Well, the two guys who

 4   beat me up and stomped me, they're the ones that took me

 5   away.

 6              He had horrific injuries, and he's got to live

 7   the rest of his life with all that goes with a brain

 8   injury:  The depression, the decreased motor skills, all

 9   of that.  He needs treatment and care probably for the

10   rest of his life.  Nothing is going to bring back the

11   vision in his left eye.  To go through all this, how can

12   we compensate somebody?  No one can wave a magic wand.

13   I'm sure the Court would love to be able to wave a magic

14   wand and make him all better.  God didn't give us that

15   power.  The only remedy available is monetary remedy, in

16   two ways; one, to provide care and treatment --

17              MR. MENGACCI:  Your Honor, please, it's beyond

18   the scope.

19              THE COURT:  Mr. Creed.

20              MR. MENGACCI:  I didn't argue anything about

21   damages.

22              THE COURT:  Fair enough.

23              MR. CREED:  Okay.  You heard my argument before

24   about punitive and compensatory, so that's fine.

25              They did it.  They're agents of the government,

1    and they did it.  You've got to stop it.  Most police

2    officers are wonderful, wonderful people, but these

3    particular officers crossed the line and tainted every

4    other police officer in the country.

5              THE COURT:  All right, ladies and gentlemen, I'm

6    going to pick back up on page 30, if you want to follow

7    along.

8              You have just heard closing arguments of

9    counsel.  I want to remind you that what the lawyers said

10   is not evidence, even if it seemed at times as if they

11   were testifying.  The lawyers merely presented their

12   arguments about what the evidence has shown.  The lawyers

13   are not witnesses.  Their credibility is not an issue that

14   should enter into your decision in this case.

15             Your verdict must be unanimous and represent the

16   considered judgment of each juror.  Each of you must make

17   your own decision, but you must consider impartially all

18   the evidence and the views of your fellow jurors.  It is

19   your duty to consult with one another and to deliberate

20   with a view toward reaching an agreement if you can do so

21   consistent with the individual judgment of each juror.

22   Until a verdict is agreed to by each juror, it is not a

23   unanimous verdict.  In the course of your discussion, do

24   not hesitate to reexamine your own individual views or to

25   change your opinions if the deliberations and the views of

1    your fellow jurors convince you to do so, but you should

2    not surrender your honest convictions about the facts or

3    about the weight or effect of the evidence solely because

4    of the opinion of your fellow jurors or merely to bring an

5    end to deliberations.  Remember at all times that you are

6    not biased; rather, you are the judges of the facts, and

7    your sole interest is to seek the truth from the evidence

8    in this case.

9           When you return to the jury room, you should

10   first elect one person to act as your foreperson, who will

11   preside over your deliberations and will be your

12   spokesperson here in court.  A verdict form has been

13   prepared for your convenience.  Focusing on the questions

14   set forth in the verdict form will assist you in your

15   deliberations.  You must complete and return the verdict

16   form in court when you have reached your decision.  You

17   will be asked to answer the questions in the order in

18   which they appear on the form, and each answer must be

19   unanimous.  When you have reached a unanimous verdict, you

20   will have your foreperson fill in your answers, date and

21   sign the verdict form.  Then inform the court security

22   officer or clerk that you have reached a verdict.  The

23   verdict form must be used only in connection with the

24   charge I have just given to you.  The terms used in the

25   verdict form are discussed in my instructions, and these

1   instructions must govern your deliberations.

2           I want to caution you now to take your time in

3   completing the verdict form.  As you will see when you

4   retire to the jury room, the form consists of several

5   questions.  Each question calls for either a yes or a no

6   answer or a monetary amount.  Answer each question as it

7   appears and only those questions.  As you review the form,

8   you will see that there are instructions printed in

9   italics after each question.  Please read these

10  instructions and follow them carefully.  Depending on your

11  answer to a particular question, it may not be necessary

12  to answer a later question.  The italicized instructions

13  will guide you through the verdict form.  Finally, be

14  consistent in your responses.

15          When you go into the jury room to begin your

16  deliberations, you will be able to review the exhibits,

17  but you will not have a transcript of the testimony.  If

18  you want any of the testimony read to you, that can be

19  done and will occur in open court.  I encourage you to

20  limit the recitation of testimony.  It is not easy to

21  locate specific portions of the testimony, and reading the

22  testimony is a time-consuming process, so please be as

23  specific as possible if and when you decide to request a

24  reading of portions of the testimony.  Requests that

25  testimony be read back, as well as any other communication

 1   with the Court, should be made in writing, signed by your

 2   foreperson and given to the clerk or a marshal.  I will

 3   respond to your request as promptly as possible, either in

 4   writing or by having you return to the courtroom so that I

 5   can address you orally.  I also must warn you that in your

 6   communications with the Court, you should never reveal

 7   your numerical division at any time.

 8           It is proper to add a final caution.  Nothing

 9   that I have said in these instructions and nothing that I

10   have said or done during the trial has been said or done

11   to suggest to you what I think your verdict should be.

12   What the verdict shall be is your exclusive duty and

13   responsibility.  Now proceed to your deliberations in the

14   jury room.  Deliberate only when all of you are present.

15   After you begin your deliberations, you are not to leave

16   the jury room without first notifying the marshal or a

17   court security officer, who will escort you.  No

18   deliberations may take place without all jurors being

19   present.  If you bring your cellphones or computer tablets

20   into the jury room, you must turn them off during your

21   deliberations.  You must not research any issue, nor

22   communicate with each other or with anyone about the case

23   through the Internet, email, Blackberry, iPhone, text

24   messaging or on Twitter, through any blog or website,

25   through any Internet chat room or by way of any other

1    social or networking websites, including Facebook,

2    WhatsApp, Linked In and YouTube.  Further, if at any time

3    a juror is in the bathroom facilities or on a cellphone,

4    the other jurors must immediately cease deliberations and

5    may not recommence deliberations until all jurors are

6    present and all cellphones are off.

7           As you deliberate, determine the facts on the

8    basis of the evidence as you've heard it and apply the law

9    as I've outlined it to you.  Render your verdict fairly,

10   uprightly and without a scintilla of prejudice.  Take as

11   long as you think is necessary to fairly and impartially

12   reach your verdict.  Thank you for your attention.

13          Now, let me say a couple of things.  First off,

14   my law clerk is going to be bringing in the original

15   verdict form and the original instructions and is going to

16   basically show you, there's a tutorial on how to use what

17   we call the jury electronic evidence review system.  It's

18   the big screen and the little screen in there.  And the

19   nice thing about the big screen is everybody can look at

20   the same thing at the same time and discuss it rather than

21   passing documents around.  There is a tutorial.  He'll

22   show you how to use that.  It's a pretty simple,

23   computerized approach.  We don't want to hear -- he

24   doesn't want to hear your deliberations, even your vote

25   for a foreperson, so please wait until after he leaves the

1    room before even electing a foreperson.

2            The other thing is I forgot to the check this

3    morning whether you ordered lunch.  Did you?  Great.

4    Hopefully your lunches will have arrived, and you can give

5    attention to that.  If they haven't yet arrived, please

6    cease deliberations when the delivery person comes in to

7    bring the lunch in.

8            All right, thank you.  Please take all your

9    things with you, and we'll wait to hear from when you it's

10   appropriate.

11           (Jury exits courtroom.)

12           THE COURT:  There was one physical exhibit,

13   which is the rocks.  I have not provided the rocks to the

14   jury yet.  I want to hear counsel's views on whether those

15   rocks should go into the jury room or whether they should

16   be -- my thought is they don't add anything.  The jurors

17   have seen those rocks.  We typically don't send physical

18   evidence in, but I'd be interested in hearing your views

19   on that.

20           MR. CREED:  Well, I don't want them to start

21   throwing the rocks at each other in the jury room, so I

22   would agree with what you just said.  Given the experience

23   in this case, maybe we should not put them in.

24           THE COURT:  All right, fair enough.

25           MR. MENGACCI:  I would agree, Your Honor.

1           THE COURT:  Okay.  Any objection to that last

2    portion of the charge as delivered?  Again, don't have

3    to --

4           MR. CREED:  I have none, Your Honor.

5           MR. MENGACCI:  No objection, Your Honor.

6           THE COURT:  Okay.  It seems to me that we do

7    need to focus, and perhaps quickly, on what

8    interrogatories, if any, are going to be given to the jury

9    in the event of a plaintiff's verdict.  One concern that I

10   have that I'll raise with you now, there's a potential

11   problem with the verdict form to this extent.  Section

12   1983 permits emotional distress damages.  Intentional

13   infliction of emotional distress obviously has emotional

14   distress damages.  If we get a plaintiff's verdict on both

15   of those causes of action with respect to a particular

16   defendant, I think we need to send an interrogatory that

17   in essence says:  Are emotional distress damages included

18   in the compensatory damages for the Section 1983 claim?

19   If so, what amount, if any, is included in both the

20   compensatory damages for 1983 and the compensatory damages

21   for intentional infliction.  There should not be a double-

22   counting, in other words, and I think that's the way to

23   resolve that.  Any concerns about that?

24           MR. CREED:  No, Your Honor.

25           MR. MENGACCI:  No, Your Honor.

```
 1              THE COURT:  So let's get back, then, to the
 2     question of any other interrogatories.  Obviously it may
 3     depend upon what the verdict is, and obviously there will
 4     be no interrogatories at all if it's a defense verdict.
 5     But are there interrogatories -- let's start with the
 6     qualified immunity issue -- are there interrogatories that
 7     the defense seeks that will elicit --
 8              MR. MENGACCI:  No, Your Honor.
 9              THE COURT:  And what about other
10     interrogatories?
11              MR. MENGACCI:  Well, you get into this messy
12     area with this case, I think, Your Honor, with regard to
13     the findings that the jury could make relative to a
14     particular defendant and the incident and the injuries
15     that may be related to that.  What I mean by that is, for
16     example, if the jury were to find that a particular
17     officer, and only one officer, hit him with a rock on the
18     left side of his face, and then another officer punched
19     and kicked him in the face, the ability to ascertain what
20     injury was caused by what separate act, not the same act
21     but separate act, becomes difficult to ascertain with
22     regard to assignment of the verdict against a particular
23     defendant.
24              THE COURT:  Right.  Well, we talked about this
25     during the charge somewhat.  I think that it becomes the
```

1    defense burden to sort that out.  If there's a verdict

2    that multiple officers engaged in excessive force, it then

3    becomes the defendant's burden to say, Although I am

4    responsible for excessive force, I'm only responsible for

5    "X" or "Y" or "Z," not the totality.  For example, I'm

6    only responsible for the broken rib because I kicked him,

7    but I did not throw a rock at his face.  We don't have

8    that evidence from the defense, and so it becomes hard.  I

9    do think that it may be appropriate to elicit the factual

10   basis of any verdict against a defendant.  So --

11              MR. MENGACCI:  Okay.  I understand, Your Honor.

12              THE COURT:  -- did Officer "X" throw a rock, or

13   did Officer "X" fail to prevent someone else from throwing

14   a rock?  I mean, there might be a reason to do that.

15              I mean, for example, I'll take Torres, just

16   because I think he's clearly on the fence side of the

17   swamp, if you will, and there's no testimony there's any

18   rocks that were there, so if the jury found that Torres

19   threw a rock, I think there would be an argument that

20   that's an inappropriate verdict.  If the jury found that

21   Torres failed to prevent somebody else from throwing a

22   rock, that might be supported by the evidence potentially.

23   So I think there may be a basis for asking some

24   clarification questions depending upon what the verdict

25   is.  But --

1           MR. MENGACCI:  I agree with Your Honor.  I think

2      that the Court and I are on the same wave of thinking

3      about that, those particular issues that we can deal with

4      if it does come back with a plaintiff's verdict, and we'll

5      know from the verdict form which one or more of the

6      defendants --

7           THE COURT:  Yes.

8           MR. MENGACCI:  -- against whom they found.

9           THE COURT:  Correct, right.  But I think these

10     are really interrogatories in aid of a Rule 50 motion, not

11     in aid of a qualified immunity motion.

12          MR. MENGACCI:  Yes.

13          THE COURT:  Okay.  Well, everyone is free to

14     leave the room, to get lunch, to be outside the

15     courthouse.  I do need to get your cellphone numbers so

16     that we can call you.  In the event that we have a note,

17     we're going to call everybody to get back here

18     immediately, and obviously delays are to be discouraged.

19     So please provide Mr. Landman with your cellphone numbers,

20     and I would encourage you to remain as close as possible.

21     Going to Greenwich for lunch today is probably not a good

22     idea.

23          MR. MENGACCI:  I'm sorry, doing what?

24          THE COURT:  Going to Greenwich for lunch.

25     There's some nice restaurants down there, but save it for

 1   another day.

 2           MR. MENGACCI:  No problem, Your Honor.  We'll

 3   stay close by.

 4           THE COURT:  Anything else we can do today?

 5           MR. MENGACCI:  No.  On another matter, how was

 6   your trip?

 7           THE COURT:  Fabulous.  There were six Supreme

 8   Court justices present and most of the judges of the Court

 9   of Appeals for the Second Circuit.  It was a very

10   memorable evening.

11           MR. MENGACCI:  Wonderful.  Thank you, Your

12   Honor.

13           THE COURT:  We'll stand in recess.

14           (Recess:  12:06 p.m. - 1:11 p.m.)

15

16           THE COURT:  All right.  We received a note.  It

17   will be marked as the next Court exhibit.  It reads:  "The

18   jury has reached a verdict."  It is not signed.  I intend

19   to bring the jury in.  Anything to take up before we do

20   that?

21           MR. MENGACCI:  No.

22           THE COURT:  All right.

23           MR. CREED:  Nothing.

24           (Jury enters courtroom.)

25           THE COURT:  Ladies and gentlemen, welcome back.

1    Juror Number 6, are you the foreperson?

2          JUROR NO. 6:  Yes.

3          THE COURT:  Has the jury reached a unanimous

4    verdict?

5          JUROR NO. 6:  Yes.

6          THE COURT:  And did you complete and sign the

7    verdict form?

8          JUROR NO. 6:  Yes.

9          THE COURT:  Would you hand that up, please.

10    Thank you.

11          All right.  Ladies and gentlemen, what I'm going

12    to do is read your verdict out loud, and then I'm going to

13    ask each of you whether this is your verdict, so please

14    listen carefully.

15          We, the jury, unanimously find:

16          Question 1:  Has Mr. Gonzalez established all of

17    the elements of a 42 U.S.C. Section 1983 claim of

18    excessive force for failure to intervene against Richard

19    Hamel?  No.  Timothy Jackson?  No.  Jason Lanoie?  No.

20    Maximo Torres?  No.

21          Question 5:  Has Mr. Gonzalez established by a

22    preponderance of the evidence all of the elements of an

23    intentional infliction of emotional distress claim against

24    any of the defendants?

25          Richard Hamel?  No.  Timothy Jackson?  No.

```
 1    Jason Lanoie?  No.  Maximo Torres?  No.

 2              Signed and dated by our foreperson.

 3              Juror Number 1, is that your verdict?  Is that

 4    your verdict?

 5              JUROR NO. 1:  It is.  It is, I'm sorry.

 6              THE COURT:  Juror Number 2 --

 7              JUROR NO. 2:  Yes.

 8              THE COURT:  Juror Number 3, is that your

 9    verdict?

10              JUROR NO. 3:  Yes.

11              THE COURT:  Juror Number 4, is that your

12    verdict?

13              JUROR NO. 4:  Yes.

14              THE COURT:  Juror Number 5, is that your

15    verdict?

16              JUROR NO. 5:  Yes.

17              THE COURT:  Juror Number 6, is that your

18    verdict?

19              JUROR NO. 6:  Yes.

20              THE COURT:  Juror Number 7, is that your

21    verdict?

22              JUROR NO. 7:  Yes.

23              THE COURT:  Juror Number 8, is that your

24    verdict?

25              JUROR NO. 8:  Yes.
```

1              THE COURT:  All right.  The verdict will be

2     recorded.

3              Ladies and gentlemen, your service is completed.

4     I want to thank you all very much for your time and

5     attention.  Obviously, anytime a jury comes back with a

6     verdict, they've made one side happy and the other side

7     disappointed.  That's why you have the hardest job in the

8     courtroom.  I want to thank all of you again for your

9     time.

10              You're now free to talk about the case, you're

11    now free to investigate the case, all those things I told

12    you you couldn't do.  The only thing that I want to remind

13    you not to do is in your oath you swore that you would not

14    reveal the deliberations of the jury or of any juror other

15    than yourself.  In other words, what happened in the jury

16    room should stay in the jury room.  But, otherwise, you're

17    free to talk about the case as much as you like.  You're

18    not required to talk about the case.  Should anybody call

19    you to talk about the case, it's like a telemarketer; you

20    can hang up the phone, all right?  So it's your voice.

21    Thanks again.

22              It's my practice to spend just a few moments

23    with any juror who would like to stick around for a few

24    minutes to talk about the case.  You're not required to

25    stay.  But I'll come back there in just a moment if you're

1    interested in chatting.  Thanks again.  Be well.  Take

2    care.  And we appreciate your service.

3              (Jury exits courtroom.)

4              THE COURT:  All right.  Any issues to take up?

5              MR. MENGACCI:  Not from the defense, Your Honor.

6              MR. CREED:  Nothing at this time, Your Honor.

7              THE COURT:  All right.  Thank you all.  We'll

8    stand in recess.

9                        (1:16 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


          I, Sharon L. Masse, RMR, CRR, Official Court

Reporter for the United States District Court for the

District of Connecticut, do hereby certify that the

foregoing pages are a true and accurate transcription of

my shorthand notes taken in the aforementioned matter to

the best of my skill and ability.


          February 15, 2017


          /S/ Sharon L. Masse
          Sharon L. Masse, RMR, CRR
          Official Court Reporter
          915 Lafayette Boulevard
       Bridgeport, Connecticut  06604
          Tel: (860)937-4177